Filed 6/23/14  Ruttan v. City of Los Angeles CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| FREDERICK J. RUTTAN, et al., | B248268 |
| Plaintiffs and Appellants, | |
| v. | (Los Angeles County Super. Ct. No. BC442559) |
| CITY OF LOS ANGELES, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark Mooney, Judge.  Affirmed.

Owen, Patterson & Owen, Gregory J. Owen and Susan A. Owen, for Plaintiffs and Appellants.

Michael N. Feuer, City Attorney; Amy J. Field, Supervising City Attorney; and Lisa S. Berger, Deputy City Attorney, for Defendant and Respondent.

_____

Frederick Ruttan was walking in the Los Angeles Zoo with his son Freddie on his shoulders when he tripped on a crack in the roadway, causing both to fall to the ground. The Ruttans filed a negligence action against the City of Los Angeles alleging that the crack constituted a dangerous condition. At trial, the jury entered a verdict in favor of the City. The Ruttans filed a motion for new trial alleging irregularities in the proceedings, jury misconduct and insufficiency of the evidence. The trial court denied the motion and the Ruttans now appeal. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Summary of Complaint and Trial*

Frederick J. Ruttan (Frederick), his wife Kimberly Ruttan and their four year old son Frederick H. Ruttan (Freddie) filed a negligence action against the City of Los Angeles arising out of an accident that occurred at the City of Los Angeles Zoo. The complaint alleged Frederick was walking with Freddie on his shoulders when he tripped on a crack in the roadway, causing both to fall to the ground.[1] Frederick and Freddie both sustained injuries. The Ruttans' complaint alleged the crack was a dangerous condition.

At trial, several witnesses testified regarding the size and shape of the crack. A zoo security officer estimated the crack was about two feet long, three inches wide and up to two inches deep in certain places. A zoo mason who inspected and repaired the crack testified that it was about 18 inches long, varied in width from zero to four or five inches and varied in depth from one quarter to one and one half inches. Plaintiffs' accident reconstruction expert John Muse testified that, based on various witness statements and photographs that had been taken shortly after the incident, he estimated that the crack was 30 inches long, up to six inches wide and approximately two inches deep.

---

[1]     Plaintiffs' appellant appendix does not contain a copy of their complaint. Our summary of their pleading and their negligence claim is based on undisputed statements in the parties' appellate briefs.

2

The City's safety expert, Taryn Johnson, testified that, in her opinion, the crack was "not a dangerous condition." Johnson explained that the crack was "clearly visible" and a "typical [road] condition" that could be "easily negotiated by people" walking within the zoo. She noted that thousands of visitors traveled over the same area of roadway on a daily basis and there had been no prior accidents involving the crack.

Johnson also testified that she believed Frederick Ruttan fell "as a result of his own inattention to the surrounding environment he was in." In support of this opinion, Johnson noted that Frederick had admitted he frequently visited the zoo and was familiar with the roadway where the accident had occurred. According to Johnson, this testimony showed that Frederick was aware the asphalt surface was permeated by numerous cracks and crevices that were "typical conditions of any asphalt surface." Johnson also noted that Frederick had admitted he was not focusing on the roadway at the time of the fall; instead, he had been looking at a display of cacti.

Plaintiffs' expert John Muse reached a contrary conclusion, asserting that the crack "represented a danger to zoo patrons due to it being a safety hazard." In support of his testimony, Muse provided a three dimensional model of the crack. Muse stated that he had constructed the model based on photographs taken before the crack was repaired. According to Muse, the model reflected "a reasonable representation of what was out there on the day of the accident . . ." Muse concluded the model and other evidence at trial showed the crack was a dangerous condition and that the zoo should have foreseen it would cause an injury.

After the parties presented their closing arguments, the jury was given an eight page special verdict form that contained numerous subsections. The first section related to whether plaintiffs had established the existence of a dangerous condition on public property. The first question in the section asked the jurors whether the City "own[ed] or control[led] the property"; the second question asked whether "the property [was] in a dangerous condition at the time of the incident." At the end of both questions, the jury was directed that it should only go on to the next question if it answered "yes."

3

On December 5, 2012, the jury returned the form with the first two questions answered. The jury found that the City did own or control the property at issue, but that the property was not in a dangerous condition at the time of the incident. The jury left all other questions blank. On January 10, 2013, the court entered a judgment in favor of the City. The City provided notice of entry of judgment on January 23, 2013.

### B.     Plaintiffs' Motion for New Trial

On February 7, 2013, the Ruttans filed a notice of intention to move for new trial based on irregularities in the proceedings, jury misconduct and insufficiency of the evidence. The Ruttans' memorandum of points and authorities asserted that the affidavits filed in support of their new trial motion established the court's jury room attendant had engaged in misconduct by pressuring jurors to reach a verdict and instructing them on an issue of law outside the presence of the court. The Ruttans also argued their affidavits showed several jurors had engaged in misconduct by (among other things): (1) interjecting expert opinion into the jury's deliberations; (2) failing to disclose pre-existing bias; (3) translating the jury instructions into Spanish; and (4) applying law that was inconsistent with the trial court's instructions. The Ruttans additionally argued that they were entitled to a new trial based on defects in the special verdict form and because the jury's verdict was not supported by substantial evidence.

The Ruttans' motion was accompanied by juror affidavits from Christopher Yih, Joshua Furrer, Ricardo Rodriguez and Mariano Barrios. These affidavits alleged, in part, that juror Dennis Helling had discussed his prior experience as a roadway supervisor when explaining why he did not believe the crack qualified as a dangerous condition.[2] The Ruttans also filed affidavits from several non-jurors, including plaintiffs Frederick and Kimberly Ruttan, court reporter Wendy Driscoll, both of the plaintiffs' attorneys and

---

[2]     We provide a more thorough description of the plaintiffs' affidavits in our legal analysis of the issues raised in this appeal.

4

a private investigator who had been retained to interview the jurors. These non-juror affidavits asserted that, shortly after the jury buzzer sounded, several people had witnessed the jury room attendant take a document off the court's bench and carry it into the jury room. Shortly thereafter, the jury reached its verdict.

The City opposed the new trial motion, arguing that plaintiffs' affidavits failed to demonstrate the court, its staff or any member of the jury had engaged in misconduct. The City also argued that, contrary to the Ruttans' assertions, there was sufficient evidence to support the jury's verdict and there was no defect in the special verdict form. In support of its opposition, the City filed juror affidavits from Angela Quiles (the jury foreperson), Michael Laidlaw and Dennis Helling.[3]

At the hearing, the trial court found that a substantial portion of the plaintiffs' juror affidavits reflected the jury's deliberative process and were therefore inadmissible under Evidence Code section 1150. The court ruled that the admissible portions of the affidavits failed to demonstrate any juror or court staff member had engaged in misconduct. On March 19, 2013, the trial court issued a minute order denying the motion for new trial. Plaintiffs filed a timely notice of appeal.[4]

---

[3] At the motion hearing, plaintiffs argued the trial court should not consider the City's juror affidavits because they did not comply with the requirements set forth in Evidence Code section 2015.5. Although the trial court did not rule on the admissibility of the City's affidavits, it informed plaintiffs' counsel it did not need to consider those affidavits because the plaintiffs' own affidavits failed to establish a new trial was warranted. On appeal, plaintiffs have not argued that the City's affidavits are defective or inadmissible and repeatedly cite to those affidavits in their briefing. We therefore assume plaintiffs have abandoned any objection to the form of the City's affidavits.

[4] Plaintiffs' notice of appeal was taken from the court's March 13, 2013 order denying their motion for new trial; the notice does not reference the court's judgment in favor of the defendant entered on January 12, 2013. "It has long been settled that an order denying a motion for new trial is not independently appealable and may be reviewed only on appeal from the underlying judgment." (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 19.) However, our

## DISCUSSION

### A. *Summary of Applicable Law and Standard of Review*

"The authority of a trial court to grant a new trial is established and circumscribed by statute. '[Code of Civil Procedure] [s]ection 657 sets out seven grounds for such a motion[.]" (*Montoya v. Barragan* (2013) 220 Cal.App.4th 1215, 1227 (*Montoya*).) As relevant here, those grounds include: (1) "Irregularity in the proceedings of the court, jury or adverse party . . . by which either party is prevented from having a fair trial"; (2) "Misconduct of the jury"; and (6) "Insufficiency of the evidence to justify the verdict." (Code of Civ. Proc., § 657, subds. 1, 2, & 6.)

To prevail on a motion for new trial, the moving party has the burden to establish both that an error enumerated in section 657 occurred and that "the error was prejudicial; that it affected a substantial right and prevented him from obtaining a fair trial." (*Donlen v. Ford Motor Co.* (2013) 217 Cal.App.4th 138, 147 (*Donlen*).) Juror affidavits may be used to establish entitlement to a new trial, but only within the limits set forth in Evidence Code section 1150: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Our Supreme Court has explained that section

---

Supreme Court has clarified that "a reviewing court should construe a notice of appeal from an order denying a new trial to be an appeal from the underlying judgment when it is reasonably clear the appellant intended to appeal from the judgment and the respondent would not be misled or prejudiced." (*Id.* at p. 22.) Although the Ruttans plainly erred in seeking to appeal from the order denying a new trial, rather than the underlying judgment, it appears clear they intended to appeal from the judgment. Moreover, there is no indication that the City, who has not raised the issue of appealability, was misled or would otherwise be prejudiced from construing the notice of appeal as being taken from the underlying judgment.

6

1150 "'distinguishes "between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved. . . . The only improper influences that may be proved under section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration."' [Citation.]" (*People v. Smith* (2007) 40 Cal.4th 483, 523.)

"Generally, rulings on new trial motions are reviewed for an abuse of discretion." (*Wall Street Network, Ltd. v. New York Times Co*. (2008) 164 Cal.App.4th 1171, 1176; see also *City of Los Angeles v. Decker* (1977) 18 Cal.3d 860, 871-872 (*Decker*) ["a trial judge is accorded a wide discretion in ruling on a motion for new trial and . . . the exercise of this discretion is given great deference on appeal"]; *Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 ["The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears"].) However, if the trial court's ruling is predicated on a question of law, we review the court's determination of that issue de novo. (*Donlen, supra,* 217 Cal.App.4th at p. 147.) Additionally, if it is determined the moving party has established an error occurred, we must review the entire record and make an independent determination whether the error was prejudicial. (*Decker, supra*, 18 Cal. 3d at p. 872 [when reviewing order "[d]enying new trial, as distinguished from an order [g]ranting a new trial, we must . . . make an independent determination as to whether the error was prejudicial"].)

In conducting our review, we accept the trial court's credibility determinations and findings of historical fact if they are supported by substantial evidence. (*People v. Nesler* (1997) 16 Cal.4th 561, 582 (*Nesler*).)

### B. The Ruttans Failed to Establish any Irregularity in the Proceedings

Section 657 permits a trial court to grant a new trial based on "[a]n 'irregularity in the proceedings[,]' [which] is a catch-all phrase referring to any act that (1) violates the right of a party to a fair trial and (2) which a party 'cannot fully present by exceptions

7

taken during the progress of the trial, and which must therefore appear by affidavits.' [Citation.]" (*Montoya, supra,* 220 Cal.App.4th at pp. 1229-1230.) "No accurate classification of such irregularities can be made, but it is said that an overt act of the trial court, jury, or adverse party, violative of the right to a fair and impartial trial, amounting to misconduct, may be regarded as an irregularity." (*Gray v. Robinson* (1939) 33 Cal.App.2d 177, 182.) "The language of the statute is sufficiently broad to include any departure by the court from the due and orderly method of disposition of an action by which the substantial rights of a party have been materially affected." (*Gay v. Torrance* (1904) 145 Cal. 144, 149.)

The Ruttans contend their evidence demonstrates that three "irregularities" occurred in the trial proceedings that warrant a new trial: (1) the trial court staff engaged in improper communications with the jury; (2) "the jurors misinterpreted a piece of evidence" introduced at trial; and (3) the special verdict form contained "confusing" and "misleading" language.

### 1. *The Ruttans failed to establish that court staff engaged in any misconduct*

The Ruttans argue their affidavits show that court personnel engaged in "two incidents of . . . misconduct that tainted the verdict." First, they assert the courtroom bailiff "apparently rushed the jurors to reach a verdict." The only evidence plaintiffs cite in support of this assertion is a statement that appears in the affidavit of juror Joshua Furrer: "The bailiff came in a couple of . . . times during [deliberations] and asked us, 'Do you think you will have a verdict today?'" The Ruttans argue that the bailiff's inquiries were a "violation of [Civil Code of Procedure section] 613" and therefore warrant a new trial.

Code of Civil Procedure section 613 states, in relevant part: "When the case is finally submitted to the jury, they may . . . retire for deliberation. . . . Unless by order of the court, the officer having them under his or her charge shall not permit any communication to be made to them . . . or make any himself or herself, except to ask them if they . . . are agreed upon a verdict." In this case, the Ruttans' evidence shows

8

nothing more than that the bailiff asked the jury about the status of its verdict.  Such conduct does not, standing alone, qualify as a violation of section 613.  (Cf. *Leonard v. Hume* (1935) 5 Cal.App.2d 41, 43 [no misconduct where bailiff "'assigned to take care of jury[] came into the jury room and stated that he had to give thirty minutes notice to the [hotel] as to whether or not the jury would be sent there for the night, and he would give them fifteen minutes in which to make up their minds as to whether a verdict would or would not be rendered in this case'"].)

The only legal authority the Ruttans cite in support of their argument is *Patton v. Royal Industries Inc.* (1968) 263 Cal.App.2d 760, in which the appellate court disapproved of the trial court's comment that the jury should have "no difficulty in reaching a verdict."  (*Id.* at p. 769.)  The appellate court concluded the clear "implication" of this statement was that the jury "was . . . taking too much time" to reach a verdict.  (*Ibid.*)  In this case, however, there is no evidence the bailiff asked his questions in a manner that suggested the jury was taking too much time to reach a verdict or that they should do so by the end of the day.  None of the seven juror affidavits contain any language that would support such a finding.  To the contrary, several of the affidavits contain language indicating the court and its staff did not "exert any pressure on the jurors."  On this record, we find no basis for concluding the Ruttans were entitled to a new trial based solely on the fact that the bailiff inquired whether the jury though it would reach a verdict by the end of the day.

The Ruttans next assert that their affidavits demonstrate the "courtroom attendant" engaged in misconduct by "answer[ing]" a jury question outside the presence of the trial judge and the parties' attorneys.  In support of this allegation, the Ruttans cite various affidavits alleging that, during deliberations, several witnesses heard the jury buzzer ring once, indicating that the jury had a question for the court.[5]  The courtroom attendant then

---

[5]     These affidavits were provided by Frederick and Kimberly Ruttan, the Ruttans' attorneys, a court reporter and a paralegal.

entered the jury room, where he remained for several minutes. The attendant then exited the jury room, removed a sheet of paper from the judge's bench and then returned to the jury room. Shortly thereafter, the jury buzzer rang again for a longer period of time, and then rang twice, indicating the jury had reached a verdict. When the trial judge summoned the jury, the jury announced it had reached its verdict. The Ruttans contend "[t]he implication from these facts" is that "the jury had an unknown question, and the courtroom attendant purported to answer it by providing an unknown document to the jurors." They further contend that such conduct violated Code of Civil Procedure section 614, which provides that, after a jury has retired for deliberations, any question it may have regarding "any part of the testimony" or "any point of law" must be made in court, and that any response must be provided in the presence of, or after notice to, the parties or counsel.

The Ruttans' appellate brief omits any discussion of how this claim was resolved in the trial court. The Ruttans submitted a memorandum in support of their new trial motion that included a block quotation of a statement that purportedly appeared in the declaration of juror Marriano Barrios. According to the memorandum, Barrios's declaration indicated the courtroom attendant had brought a piece of evidence into the jury room during deliberations and committed various other acts. However, during the motion hearing, the trial court noted that Barrios's declaration did not contain the statement that had been attributed to him in the memorandum. Plaintiffs' counsel was unable to account for this discrepancy. The court expressed concern that plaintiffs had identified no other evidence to support their accusation that the courtroom attendant had committed misconduct: "You know, you're making a very serious charge here about the conduct of the courtroom staff. You should have some evidence to back it up rather than having to see him getting something off my desk. . . . We don't know whether it was something he's putting in the file cabinet there, whether it is another question form, whether it's a verdict form or if there was anything even given to the jury. [¶] . . . [¶] Then where do I have any evidence in any one of these juror declarations that there was any misconduct by the courtroom staff?" The court permitted the counsel time to review

10

the juror affidavits, and reiterated: "[Plaintiffs] make this bold assertion that the courtroom attendant answered a question rather than the court. Where is that? Where is the evidence of that? Plaintiffs counsel eventually conceded that he "did not have an answer" and requested that the court "move off the subject."

Although the Ruttans were unable to provide the trial court with a single piece of evidence in support of their claim that the courtroom attendant gave instruction to the jury, they nonetheless argue on appeal that the court erred in denying their claim. The Ruttans have not identified any evidence in the record on this issue; instead, they simply reassert that we must infer the courtroom attendant instructed the jury outside the presence of the court based solely on affidavits reporting that the attendant was seen walking into the jury room with a document shortly after the jury buzzer sounded. As explained by the trial court, the Ruttans' theory as to what occurred in the jury room is based on pure speculation. Given the events that occurred in the trial proceedings, we find it troubling that plaintiffs' counsel chose to pursue this meritless claim on appeal.

### 2. *The jurors' findings regarding the accuracy of expert Muse's model of the crevice does not qualify as an irregularity in the proceedings*

The Ruttans next contend that they are entitled to a new trial because their affidavits show some jurors were "confused" by their expert's three dimensional model of the crack in the zoo roadway. Before trial, the Ruttans informed the court that their expert, John Muse, intended to rely on a model he had constructed of the crack. Although the City objected to the model's admission, the court permitted it. During his testimony, Muse explained that he had constructed the model based on photographs of the roadway and believed it reasonably represented the size and shape of the crack at the time the incident occurred. Two of the Ruttans' juror affidavits contain statements indicating the jury did not find the model to be credible. Mariano Barrios commented that he believed "[t]he mold was ridiculously too large . . . the mold was so largely exaggerated it didn't represent what the crack looked like at the time of the accident." Joshua Furrer's affidavit included a similar statement: "The model that the plaintiffs had

11

was ridiculous . . . and nothing even close to the size of the actual crevice in the photos. The model was so exaggerated that I believe it was biased."

The Ruttans contend the statements of Barrios and Furrer "establish[] the jurors were obviously confused by the model" because the trial court would not have admitted it into evidence if it was "in fact 'exaggerated.'" According to the Ruttans, "[t]he model was meant to aid the jury, not to be independently judged by the jury. A verdict should not be rendered on the basis of the jury's perception as to the size, shape or color of a model as not accurately representing the crevices at issue, particularly where, as a matter of law, it would not have been entered into evidence if these perceptions were accurate."

This argument is without merit. First, Barrios and Furrer's statements that they found the model to be "exaggerated" and "ridiculous" are inadmissible under Evidence Code section 1150. These statements do not relate to any objectively ascertainable overt act; instead, the comments "show the effect" the plaintiff's expert evidence had on the declarants. (Evid. Code, § 1150, subd. (a) ["No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror . . . in influencing him to assent to or dissent from the verdict"]; see also *People v. Steele* (2002*)* 27 Cal.4th 1230, 1266 (*Steele*).)

Second, even if the statements were admissible, we would reject the Ruttans' assertion that they are entitled to a new trial because some jurors did not find their expert's evidence to be credible. The Ruttans cite no authority in support of their novel proposition that a jury must accept the accuracy of an expert model merely because the trial court has admitted the model into evidence. We fail to comprehend why the Ruttans should receive a new trial based on the jury's rejection of their own expert's evidence.

### 3. *The Ruttans have waived any objection to the special verdict form*

The Ruttans argue they are entitled to a new trial because the following question on the special verdict contained an ambiguity that may have confused the jury: "Was the property in a dangerous condition at the time of the incident?" The Ruttans contend the

use of the term "property" may have misled the jury "into believing they were supposed to make a decision as to the entire roadway, rather than just the crevice [in the roadway]."

The transcript of the trial proceedings demonstrate that, before submitting the verdict form to the jury, the court asked counsel for both parties whether they had any objection to the document's form. Both parties assented to the verdict form. The Ruttans raised their complaint about the verdict form for the first time in their new trial motion, which was filed after the jury had been discharged.

It is "settled ruled" that a party who is shown a verdict form and fails to object before it is sent to the jury "waived any right to complain as to [the verdict's] form." (*Lynch v. Birdwell* (1955) 44 Cal.2d 839, 851 [waiver applied where verdict forms "were shown to counsel for both sides before the case went to the jury"]; *Jensen v. BMW of North America, Inc.* (1995) 35 Cal.App.4th 112, 131 [party "waived any objection to the special verdict form by failing to object before the court discharged the jury"].) The Ruttans have presented no argument why this rule should not be applied under the circumstances presented here.[6] To the extent the Ruttans believed the term "property" rendered the verdict form ambiguous or misleading, it had a duty to object before the form was submitted to the jury, thereby giving the trial court an opportunity to address their concerns.

---

[6] In their appellate brief, the Ruttans argue: "The fact that the special verdict sheet was prepared by both parties does not preclude the assertion that it confused or misled the jury." However, the only case they cite in support of this proposition is *Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, which involved an inconsistency in the jury's answers to the verdict form, not an ambiguity in the form itself. (See *id*. at p. 1182.) In this case, the Ruttans do not argue that they are entitled to a new trial based on inconsistent jury answers within the verdict form. They argue only that a form they initially approved of was, in hindsight, ambiguous.

### C. *The Ruttans Failed to Establish any Juror Misconduct*

The Ruttans argue they are entitled to a new trial because their affidavits show jurors Dennis Helling, Joshua Furrer and Angela Quiles engaged in numerous forms of prejudicial misconduct. (See Code Civ. Proc., § 657, subd. 2.)

#### 1. *Procedures and standard of review applicable to jury misconduct claims*

When a party seeks a new trial based on jury misconduct, the court undertakes a three-step inquiry. First, the court must determine whether the declarations offered in support of the motion are admissible under Evidence Code section 1150. If the declarations are admissible, the court must next consider whether the moving party has established that misconduct occurred. (See *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625 ["The moving party bears the burden of establishing juror misconduct"].) Finally, assuming misconduct is found, the court must determine whether it was prejudicial. (*People v. Duran* (1996) 50 Cal.App.4th 103, 112-113 (*Duran*).) "Juror misconduct raises a rebuttable presumption of prejudice." (*People v. Dykes* (2009) 46 Cal.4th 731, 809.) The presumption of prejudice "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct." (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 417 (*Hasson*).)

"On review from a trial court's 'determin[ation of] whether misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.]"' [Citations.]" (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345 (*Barboni*).) "[I]t is the trial court that must assess the credibility of affiants or declarants, and the trial court is entitled to believe one over the other." (*Whitlock v. Foster Wheeler* (2008) 160 Cal.App.4th 149, 160 (*Whitlock*).) Where the trial court denies a motion for a new trial submitted on affidavits, we view the affidavits "in the light most favorable to the [prevailing party]" (*Gordon v. Gordon* (1954) 126 Cal.App.2d 481, 486 (*Gordon*); see also *Foley v.*

14

*Hornung* (1917) 35 Cal.App. 304, 316) and "assume the . . . court impliedly resolved [any evidentiary] conflicts in favor of the prevailing party." (*Andrews v. County of Orange* (1982) 130 Cal.App.3d 944, 957 [disapproved on other grounds in *Nesler, supra*, 16 Cal.4th at p. 582, fn. 5]; *Young v. Brunicardi* (1986) 187 Cal.App.3d 1344, 1350-1351.) However, any uncontroverted acts set forth in the moving party's affidavits are "deemed established." (*Tapia v. Barker* (1984) 160 Cal.App.3d 761, 766.)

When the trial court has denied a motion for new trial, we review independently whether any established conduct amounts to juror misconduct and whether such misconduct is prejudicial. (See *People v. Collins* (2010) 49 Cal.4th 175, 242; *People v. Ault* (2004) 33 Cal.4th 1250, 1260-1263.)

### 2. *The Ruttans failed to establish Dennis Helling interjected his expertise into the jury's deliberations*

The Ruttans argue juror Dennis Helling engaged in prejudicial misconduct by injecting his expertise into the jury's deliberations. (See generally *People v. Cabrera* (1991) 230 Cal.App.3d 300, 303 (*Cabrera*) ["It is . . . misconduct for a juror to inject his or her own expertise into the jury's deliberation"].) In support, the Ruttans cite several juror affidavits stating that Helling referenced his experience as a roadway supervisor when explaining why he did not believe the crevice was a dangerous condition.

### a. *Factual summary*

During voir dire, Dennis Helling disclosed that he had previously worked as a "road superintendent at L.A. County Road Department." Helling explained that, as part of his job duties, he was occasionally required to inspect areas where an accident had been reported and make a determination whether a road repair was necessary. Helling also stated he had extensive experience providing "preventative maintenance" on roadways. When defense counsel inquired whether any of the prospective jurors had experience "with asphalt pouring or repair," Helling stated he had spent over 40 years examining and repairing asphalt roadways and filling potholes and crevices. However, Helling also stated he did not consider himself "an expert at anything" and would be able

15

to listen to expert witnesses who might testify as to the condition of a road. Neither party requested that Helling be excused from serving on the jury.

In support of their motion for new trial, the Ruttans provided three juror affidavits alleging that Helling referenced his prior work experience during the jury's deliberations. The affidavit of Joshua Furrer stated: "[Helling] told the jurors his experience of being out on the streets working for the County for years. He would have to decide if something was a dangerous condition or not. Helling told us that, based upon his experience, it was not a dangerous condition. He told us that he would not have reported it as a dangerous condition and would not have reported it to be fixed." The affidavit of juror Christopher Yih contained similar information: "Helling[] told the jurors that the crevice was not a dangerous condition in his experience of working for the County. He said that he would not have reported that as a dangerous condition to the County [¶] . . . [¶] Helling said . . . this [crevice] was just a minor risk. It wasn't a pothole, so it wasn't a major risk; it was just a minor risk. [¶] . . . [¶] He told us he knew what a major risk was vs. what a minor risk was from his years of experience out in L.A. County." The affidavit of Ricardo Rodriguez contained virtually identical allegations: "[Helling] told us that in his experience, after all the years of working for the County, that it wasn't dangerous. It was just a little crevice and that, in his mind, in all his years of working for the County, he would not have reported that as being a dangerous condition and wouldn't have said that it needed to be fixed."**7**

---

**7** The Ruttans also provided a declaration from a private investigator who interviewed Helling after the trial. The investigator's declaration states that, during the interview, Helling said "his job [with the county] was to check the streets in 500-square-mile area . . . to look for dangerous conditions and that the policy of the County of Los Angles is to find potholes that are greater in size than 1 or 1½ inches and then report them to be filled. . . . [¶] Mr. Helling told the jurors during jury deliberations that the County had a 1 1/2 inch standard for potholes to be fixed." None of the juror affidavits indicate that Helling referenced this 1½ inch standard at any time during jury deliberations. The Ruttans' opening appellate brief does not reference this portion of the investigator's declaration, which is hearsay. (See *Burns v. 20th Century Ins. Co.* (1992) 9

16

The City's juror affidavits filed in opposition to the new trial motion do not specifically dispute whether Helling made any such comments. The affidavits of jurors Quiles and Helling do not address the issue in any manner; the affidavit of Michael Laidlaw states only that he could "not recall any jurors presenting outside information from their personal experience."

At the hearing on the motion for new trial, the trial judge concluded that the Ruttans' affidavits failed to establish Helling had engaged in misconduct: "We want jurors to use their common sense in evaluating evidence and that common sense is going to be based upon necessarily their life experiences. Whether or not this crevice represented a dangerous condition really is not an area for expert opinion. Although people often have experts in these cases, you don't need an expert. This is something not outside the range of common experience and what we have [in the juror affidavits] is really an example of . . . jurors giving their opinions based upon their life experiences." The court continued: "Just because the [plaintiffs] are calling [Helling] an expert, doesn't make him an expert. He's expressing his opinion based upon his life's experiences that everyone knew what his experiences were when you left him on the jury. . . . . And all that you've given me really is about people talking about the case and what they're thinking about."

### b. Helling's comments do not constitute juror misconduct

The City initially contends that the portion of the Ruttans' affidavits describing the comments Helling made to other jurors during deliberations are inadmissible under Evidence Code section 1150 because they reflect Helling's subjective reasoning process. (See *Duran, supra,* 50 Cal.App.4th at p. 112 [when assessing a new trial motion based on jury misconduct, the court first determines whether the declarations offered in support of the motion are admissible under section 1150].) We disagree. "'[A] statement by a juror

_____

Cal.App.4th 1666, 1670-1671 [declaration from investigator describing statements of two jurors during their deliberations was "inadmissible hearsay"].)

17

during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible [Citation.]' [Citation.]" (*Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 791 (*Grobeson*); see also *Steele, supra,* 27 Cal.4th at p. 1265 ["portions of the [juror] declarations [that] involved statements made . . . within the jury room" are admissible].)[8]

We must therefore consider whether the statements set forth in the Ruttans' affidavits, viewed in the light most favorable to the City, establish misconduct. (*Duran, supra,* 50 Cal.App.4th at p. 112 [if the juror affidavits are admissible, the court must next consider whether the facts establish misconduct]; *Gordon, supra,* 126 Cal.App.2d at p. 486 [reviewing court must view the juror affidavits "in the light most favorable" to the prevailing party].) A juror "should not discuss an opinion explicitly based on specialized information obtained from outside sources. Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct." (*In re Malone* (2011) 12 Cal.4th 935, 963 (*Malone*).) However, "[i]t is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work." (*Id.* at p. 963.)

Our Supreme Court has emphasized that "if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence. Moreover, during the give and take of

---

[8] Other portions of the Ruttans' affidavits are clearly inadmissible under section 1150. For example, juror Furrer's affidavit alleges that Helling's comments "flipped the jury"; Juror Yih similarly alleges that Helling's comments may have "swayed some of the jurors." Because these statements do not convey what Helling said, but rather convey the effect his statements had on other jurors, they are inadmissible. (See *Steele, supra,* 27 Cal.4th at p. 1266 [under section 1150, evidence of a juror's statements to other jurors is admissible, but evidence "showing the effect [of those] statements" on other jurors is not].)

18

deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence.  We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations.  'Jurors are not automatons.  They are imbued with human frailties as well as virtues.'  [Citation.]"  (*Steele, supra,* 27 Cal.4th at p. 1266.)  There is, however, "[a] fine line . . . between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which . . . [is] misconduct.  [Citation.]"  (*Ibid.*)

In *Steele, supra,* 27 Cal.4th 1230, the Supreme Court applied these rules in determining whether jurors had engaged in misconduct by referencing their past work experiences when assessing trial evidence during deliberations.  The defendant in *Steele* was charged with first degree murder after stabbing a women.  The defense argued, in part, that the jury should convict him of a lesser offense because he suffered from psychological impairment resulting from his experiences in the Vietnam war.  The defense called an expert who testified that the defendant's military records showed he was in the Navy and had received two weeks of training at a "'counter-insurgency school' for 'SEALS' that teaches the students to kill people with knives."  (*Id*. at p. 1240.)  The witness stated that although the defendant's records did not show he had engaged in combat duty while in Vietnam, his SEAL training suggested he may have had secretive combat assignments that were not reflected in his official records.

The defendant also called a neurologist who testified that he had conducted a "'BEAM' test" to map the electrical activity of the defendant's brain, which showed various abnormalities in the defendant's brain function.  (*Steele, supra,* 27 Cal.4th at p. 1241.)  The neurologist admitted BEAM testing "was a fairly new technique" and that there were only 16 people in the control group that was used to test the new technology on individuals who were of a similar age to the defendant.  (*Ibid*.)  A second doctor testified that although the scientific community was divided on the use of BEAM testing,

he believed the technology was generally accepted. (*Id*. at p. 1242.) The jury convicted the defendant of first degree murder.

Defendant sought a new trial based, in part, on jury misconduct. In support, the defendant provided juror affidavits indicating that multiple jurors had "'dr[awn] upon their [military] experience'" in assessing whether the defendant had been exposed to combat in Vietnam. One juror stated that, based on his military experience, he did not believe the defendant had served in Vietnam "at a time when he might have been exposed to combat." (*Steele, supra,* 27 Cal.4th at p. 1259.) Two other jurors stated they had attended the "'counterinsurgency [SEAL] school'" and had not been taught how to kill people. (*Ibid*.) Two other jurors "with medical experience" informed the jury that "'the criteria that the Doctor's [*sic*] used to establish the validity of the [BEAM] Test' was 'inadequate' based on 'what they ha[d] learned in their own experience in the medical field.'" (*Id*. at p. 1260.) The trial court denied the motion.

The Supreme Court affirmed, concluding that defendant's assertion the "jurors committed misconduct by 'the offering of expertise . . ., during deliberations, to help the jury as a whole to resolve key factual issues the case presented.[,]' . . . lack[ed] merit." (*Steele, supra,* 27 Cal.4th at p. 1260.) The Court explained that "extensive evidence was produced concerning the nature and extent of defendant's military training and Vietnam experience and its effect, if any, on his crimes, as well as evidence concerning the validity of BEAM testing. This evidence was susceptible of various interpretations. The views the jurors allegedly asserted here were not contrary to, but came within the range of, permissible interpretations of that evidence. All the jurors, including those with relevant personal backgrounds, were entitled to consider this evidence and express opinions regarding it." (*Id*. at pp. 1265-1266.)

In *McDonald v. Southern Pacific Transportation Co.* (1999) 71 Cal.App.4th 256 (*Southern Pacific*), which is the primary case on which the Ruttans rely, the appellate court ruled that a juror had committed misconduct by providing expert opinion that was based on information that had not been presented at trial. The plaintiff in *Southern Pacific* was a railroad worker whose job duties required him to guard a "J-crossing"

located within a rail yard. To ensure the crossing remained clear of vehicles, plaintiff's "common practice" was to stop his truck on the tracks, and then exit the crossing when a train came into view. (*Id.* at pp. 259-260.) On the day of the incident, plaintiff's truck stalled on the tracks and he was struck by an oncoming train. Plaintiff sued the railroad company for negligence, asserting that "defendant had provided an unsafe workplace by placing plaintiff on the tracks to guard the . . . crossing, a condition that could have been obviated by maintaining crossing gates." (*Id.* at p. 260.) Defendant's "yard trainmaster" testified that he was uncertain why the rail company had not installed crossing gates. (*Id.* at p. 261.) He further testified that, on this particular "J-crossing," he would expect that if crossing gates were present, they would be deployed 10 to 18 times a day. (*Ibid.*)

After the jury found in defendant's favor, plaintiff filed a motion for new trial arguing that a juror, Fred Silverman, had improperly injected his own expert opinion into the jury's deliberations. During voir dire, Silverman had identified himself as a "career transportation consultant" who had previous experience "'involving railroad . . . grade crossings.'" (*Southern Pacific, supra,* 71 Cal.App.4th at p. 262.) Plaintiff presented an affidavit demonstrating that, during deliberations, Silverman told the other jurors that crossing gates were not a viable option because the "J-crossing" at issue was located within a rail yard. Silverman explained that safety gates were triggered by sensors and drew a diagram showing where he believed the sensors would have to be placed in relation to the J-crossing. According to the jury affidavit, Silverman then stated: "'"If they place these sensors here, because this is a rail yard, there would be cars sitting on the tracks all the time and the arms would be down all the time . . . This is the reason why the arms weren't installed."'" (*Ibid.*) Silverman provided an affidavit confirming he had told the jury "'that the sensors which operated crossing gates would make it impractical to have gates at the location of the accident, because they would be triggered all day long.'" (*Ibid.*) Plaintiff argued Silverman's statements constituted prejudicial misconduct because the parties had not introduced any evidence at trial about what role, if any, sensors played in controlling safety gates. The trial court denied the motion.

21

The appellate court reversed, explaining:  "Speaking with the authority of a professional transportation consultant, Silverman interjected the subject of 'sensors,' on which there had been no evidence at trial.  He also expounded, and . . . illustrated with a diagram, his opinions about where such sensors would be placed to operate crossing gates for the J-crossing, how yard operations would activate those sensors, and consequently that gates would be infeasible to protect the crossing because they would continually block it. [¶]  This exposition went far beyond the evidence in the case.  Silverman contradicted the testimony of defendant's own trainmaster . . . with respect to the frequency with which crossing gates would have been lowered, and also offered a rationale for the absence of gates, which [the trainmaster] had been unable to provide. [Citation.]  Silverman's opinion not only derived from sources outside the evidence, but also rebutted a significant element of plaintiff's proof."  (*Southern Pacific, supra,* 71 Cal.App.4th at p. 264.)  The court further noted that the information Silverman provided did not relate to "matters of common experience," but involved his own opinions about where "sensors" for the J-crossing gates would be placed and "how the traffic in the yard would cause them to operate."  (*Ibid*.)

In this case, it is a close question whether the Ruttans' jury affidavits show Dennis Helling used his "background in analyzing the evidence, which is appropriate," or whether they show he "inject[ed] 'an opinion explicitly based on specialized information obtained from outside sources[,]'" which is misconduct.  (*Steele, supra,* 27 Cal.4th at p. 1266.)  Viewed in the light most favorable to the City, the affidavits indicate Helling told other jurors that, in his experiences as a County road supervisor, he would not have reported the crack in the zoo roadway as a dangerous condition because he believed it was merely a small crevice, not a pothole.  We find aspects of these comments to be problematic.  First, a juror might reasonably interpret Helling's statements to mean that he had special training to identify dangerous conditions in roadways and that crevices (as opposed to potholes) do not qualify as such.  Second, Helling's comments related to the central issue in the case: whether the crevice qualified as a dangerous condition.  Thus, this was not a situation like *Steele*, where the jurors' comments related to the weight that

22

should be assigned to isolated statements of experts who were testifying about issues not directly related to the defendant's guilt or innocence.

However, it is also apparent that Helling's comments were less problematic than the juror statements at issue in *Southern Pacific*. Helling did not actually reference or present the jury with "new evidence from sources outside the trial." (*Southern Pacific, supra*, 71 Cal.App.4th at p. 263.) He did not, for example, tell the jury that road supervisors apply a particular test or standard to assess the dangerousness of cracks. Nor did he "explicitly" state that his opinion was based on specialized knowledge or information he had obtained during his career as a road supervisor. (*Malone, supra,* 12 Cal.4th at p. 963 [jurors "should not discuss an opinion explicitly based on specialized information obtained from outside sources"].)

Although we acknowledge this is a close issue, we ultimately agree with the trial court's determination that Helling's comments did not rise to the level of juror misconduct. At trial, the parties introduced extensive amounts of conflicting evidence (including conflicting expert opinion) regarding whether the crevice presented a substantial risk of injury or minor risk of injury. Helling did not supplement this testimony with his own expert opinion, nor did he rely on additional evidence not otherwise presented at trial. Instead, interpreted in the light most favorable to City, his comments indicate he used his past work and life experiences to assess the conflicting evidence the parties presented at trial. (*Steele, supra*, 27 Cal.4th at p. 1266 ["we must allow . . . jurors to use their experience in evaluating and interpreting that evidence"].)

Helling's background was disclosed to both parties during voir dire. While it is possible some jurors may have assumed his opinion was informed by specialized knowledge he acquired during his time as a road supervisor, our Supreme Court has emphasized that referencing one's background and past work experiences during the course of deliberations does not, without more, constitute misconduct. (*Steele, supra,* 27 Cal.4th at p. 1266 ["[D]uring the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors . . . never refer to their background during deliberations"].)

23

Moreover, as the trial court observed, Helling's comments–which essentially described whether he thought a crack in the pavement presented a substantial danger to the public– related to a matter of common experience. (Compare *Southern Pacific, supra*, 71 Cal.App.4th at p. 264 [jurors statements regarding the placement and operation of crossing gate sensors did not relate to a matter of "common experience"].) We therefore conclude that the Ruttans' jury affidavits do not demonstrate Helling engaged in misconduct.

### 3. *The Ruttans failed to establish juror Joshua Furrer engaged in misconduct*

The Ruttans argue they introduced evidence establishing juror Joshua Furrer engaged in three forms of prejudicial misconduct: (1) concealing "bias" during voir dire; (2) providing a Spanish translation of the jury instructions to jurors who had difficulty understanding English; and (3) improperly considering an attorney's silence as "evidence."

#### a. *The Ruttans failed to establish Furrer concealed any bias during voir dire*

The Ruttans first contend that Furrer concealed his "bias against [their] case" by telling the "the court and the parties during voir dire that he could be impartial." The rely on two pieces of evidence to support this charge. First, they cite Furrer's statement at voir dire that he would be willing to award the Ruttans damages if they were able to prove by a preponderance of the evidence that the City was responsible for their injuries. Second, they cite the following statements in Furrer's affidavit: "I thought this little situation of falling on a crack at the zoo was ridiculous"; "I don't think that this case should have been in the courtroom in the first place. . . . They were asking for millions of dollars and it was just ridiculous. Why did they leave me on the jury? Why did they want me to be on this case? I told them when they interviewed me, this is silly. This is silly to litigate a case such as this." The Ruttans contend that, considered together, these

24

statements demonstrate Furrer held "prejudice[s] against [them that] w[ere] concealed during voir dire."**9**:

"Concealment by a juror during his voir dire examination of a state of mind which would prevent his acting impartially is misconduct constituting an irregularity for which a new trial may be granted under section 657, subdivisions 1 and 2, of the Code of Civil Procedure. [Citations.]" (*People ex rel. Dept. of Pub. Wks. v. Curtis* (1967) 255 Cal.App.2d 378, 388.) "[A] motion for a new trial will not be granted upon the ground that a juror upon voir dire examination has incorrectly answered questions, in the absence of a showing that (1) prejudice has resulted to the appealing party, or (2) there were willfully false and untruthful answers given by the juror which would lead to the inference that the juror was animated by a dishonest motive in qualifying." (*George v. City of Los Angeles* (1942) 51 Cal.App.2d 311, 321.)

The Ruttans have failed to establish Furrer concealed any bias during the voir dire proceedings. First, the record the Ruttans have provided is inadequate to permit review of this issue. (See *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574 (*Uribe*) ["It is well settled, of course, that a party challenging a judgment has the burden of showing reversible error by an adequate record"].) Where, as here, it is claimed a juror made false answers or concealed information "on voir dire examination, the question can be resolved only by an examination of the stenographic report of the voir dire proceedings." (*Dunford v. General Water Heater Corp.* (1957) 150 Cal.App.2d 260, 264; see also *Uribe, supra,* 41 Cal.3d at p. 574 [rejecting concealed bias claim based on appellant's failure to provide a "transcript of the voir dire proceeding"]; *Herrera v. Hernandez* (2008) 164 Cal.App.4th

---

**9**     Although the statements in Furrer's juror affidavit describe his feelings about the plaintiffs' case, rather than any overt act that occurred during the trial proceedings, we may nonetheless consider the evidence for the purpose of determining whether he concealed improper biases at voir dire. (See generally *Grobeson, supra,* 190 Cal.App.4th at p. 791 [when applying Evidence Code section 1150, courts "treat statements of bias differently from other statements about a juror's mental processes. . . . The right to an impartial jury could not be protected without a recognition of this distinction"].)

1386, 1390 [rejecting jury misconduct claim predicated on "concealed bias" because "plaintiff did not provide this court with a transcript of the voir dire proceedings"].) Rather than providing a transcript of the voir dire proceedings, the Ruttans have provided an appellate appendix that contains only those passages from his voir dire testimony that allegedly support their claim.**10**

Second, we fail to see how the statements set forth in Furrer's juror affidavit disclose any pre-existing or improper "bias" against the Ruttans' case. Furrer's comments that he found the case to be "silly" and "ridiculous" do not show that he held such views prior to the presentation of the evidence. Other portions of his affidavit demonstrate his opinions were, in fact, based on the evidence presented at trial. For example, Furrer states that he believed "the condition of the road in question was not dangerous, and no one should really come to any harm walking on it." He also states that "[t]he plaintiff's case showed me a very, very ,very bad fall, but what about the legal aspects of the dangerous condition? I couldn't see how the crevice was a dangerous condition." The mere fact that Furrer described plaintiffs' case as "ridiculous" and "silly" in other portions of the affidavit is not sufficient to show he was motivated by bias, rather than the evidence at trial.

Third, the Ruttans have failed to show Furrer provided any misleading or untruthful answer during voir dire. The only statement at voir dire the Ruttans allege to

---

**10**     Portions of the voir dire transcript that were omitted from the Ruttans' appendix (which the City provided through augmentation of the record) demonstrate that Furrer informed the court and counsel that he had a "heavy bias" against civil cases. Specifically, Furrer told the court he had a "bias" against any kind of "civil case" he "might consider petty," explaining: "I'm not trying to downplay anything on this case, it's just regarding civil cases generally. That is the kind of stand I take, so I can't come in here and not let the court know I am biased. [¶] . . . [¶] There is a heavy bias there." When the court asked Furrer whether his dislike of "civil cases" would affect his "ability to be fair to plaintiff . . . if they prove their case," he responded: "I don't think it would . . ., but it will have some sort of affect on me. I can't say that it won't." These statements appear to belie plaintiffs' assertion that Furrer somehow concealed any pre-existing hostilities he may have harbored toward civil cases such as this one.

26

have been misleading was Furrer's assertion that he would be able to award damages if the plaintiffs were able to prove their case by a preponderance of the evidence. As Furrer's affidavit makes clear, however, he did not believe the evidence at trial was sufficient to prove the City was responsible for the Ruttans' injuries. The statements in the affidavit are therefore completely consistent with his statements at voir dire.[11]

### b. The Ruttans failed to establish Furrer interpreted the jury instructions into Spanish

The Ruttans assert that Furrer's affidavit reveals he "impermissibly acted as an interpreter for Spanish-speaking jurors." In support, they rely on the following statement in his affidavit: "Two [Hispanic] jurors . . . had a problem understanding the law regarding dangerous condition. Angela [Quiles] and I had to read the instructions thoroughly to help these fellow jurors. When I was explaining to those jurors who did not understand the law, I went very slowly with it and explained to them in English, maybe a little Spanish as well, I don't remember, but read to them exactly what the law is." The Ruttans contend this statement shows Furrer engaged in an "unauthorized" and "illegal" translation that requires a new trial.

The trial court did not err in finding that this single statement was, standing alone, insufficient to establish Furrer engaged in misconduct. First, as the trial court emphasized at the motion hearing, Furrer's statement makes clear that he could not remember whether he had used Spanish when attempting to explain the instructions to other jurors. Moreover, none of the other juror affidavits indicate Furrer spoke Spanish at any point in the deliberations. Based on the record before us, there is no basis to reject

---

[11] We also reject the Ruttans' assertion that Furrer's affidavit demonstrates he "prejudged the case" before "even hearing the opening arguments." As explained above, Furrer's affidavit repeatedly states that he did not believe the evidence at trial showed the crack in the roadway qualified as a dangerous condition. Furrer's statements that he found plaintiffs' case to be "ridiculous" and "silly" do not show he formed these opinions before hearing the evidence.

the trial court's factual finding that the Ruttans' evidence did not prove Furrer translated any portion of the jury instructions into Spanish. (See *Barboni, supra,* 210 Cal.App.4th at p. 345 ["[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence"]; *Whitlock, supra,* 160 Cal.App.4th at p. 160 ["it is the trial court that must assess the credibility of affiants or declarants"].)

Second, even if we were to assume Furrer did use a "little Spanish" when explaining the instructions to Hispanic jurors, the Ruttans have identified no evidence suggesting this conduct had any effect on the verdict. None of the Ruttans' affidavits indicate that the Hispanic jurors were unable to understand the English version of the court's instructions. Although Furrer's affidavit states that he believed two Hispanics were having difficulty understanding "the law regarding dangerous condition," his affidavit does not allege this purported lack of understanding was caused by any inability to speak or read English. Ricardo Rodriguez's affidavit states that he was one of the Hispanic jurors that Furrer spoke to; his affidavit contains no indication that he had difficulty understanding English or was confused by the language of the court's instructions. The affidavit of Angela Quiles, the jury foreperson, states that all of the jurors were able to articulate their views about the case in English. Her affidavit also states she did not believe any of the jurors "who sp[oke] Spanish were having a difficult time understanding the deliberations." According to Quiles, juror Maria Barranco became upset after juror Furrer "accused her of not understanding the jury instructions." Barranco told Furrer "she did understand [the instructions]" and used "English throughout all deliberations and . . . articulated her opinions in English. Given the total absence of evidence showing that any Hispanic juror was unable to understand the English version of the instructions, there is no reasonable probability that Furrer's alleged use of a "little Spanish" had any effect on the verdict. (See *Hasson, supra,* 32 Cal.3d at p. 417 [when misconduct is established, reviewing court conducts an "examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct"].)

28

The only case the Ruttans cite in support of their assertion they are entitled to a new trial based on Furrer's "illegal translation" is *Cabrera, supra,* 230 Cal.App.3d 300. The parties in *Cabrera* did not dispute that a Spanish-speaking juror had informed non-Spanish speaking jurors that the trial court translator had erred in translating a witness's testimony. The court held that these actions constituted misconduct: "[The juror] committed misconduct by failing to rely on the court interpreter's translation, as she promised she would during voir dire. She committed further misconduct by sharing her personal translation with her fellow jurors thus introducing outside evidence into their deliberations. [¶] If [the juror] believed the court interpreter was translating incorrectly, the proper action would have been to call the matter to the trial court's attention, not take it upon herself to provide her fellow jurors with the 'correct' translation." (*Id.* at p. 304.)

Nothing similar occurred here. As explained above, there is insufficient evidence to show Furrer actually translated any instruction into Spanish; there is no evidence any of the Spanish speaking jurors were unable to understand the English version of the instructions; and there is no evidence that Furrer's translation—if such conduct did in fact occur—actually conflicted with the instruction provided by the trial court. Finally, there is no basis on which to find that anything Furrer did affected the record of the proceedings in any way.

### c. *Furrer's comment about counsel's silence is inadmissible*

The Ruttans contend the following statement in Furrer's affidavit demonstrates that he improperly "considered the silence of the Ruttans' counsel as 'evidence' to determine the case": "Something that destroyed the case for me was the plaintiff attorney never explicitly stated 'this is a dangerous condition.'" According to the Ruttans, this comment shows Furrer failed to follow the trial court's admonishment "that the comments and arguments of counsel were not evidence."

Furrer's statement regarding counsel's silence does not relate to any objectively ascertainable "overt act"; it serves only to demonstrate the effect counsel's silence had on

Furrer's view of the case.  This type of statement is inadmissible under section 1150.  (See *Smith, supra,* 40 Cal.4th at p. 523.)

    4. *The Ruttans failed to establish jurors Furrer, Helling and Quiles did not follow the court's instructions*

   The Ruttans argue jurors "Furrer, Quiles and Helling . . . impermissibly interpreted the law for other jurors in determining whether the crevice was a dangerous condition."  The Ruttans assert the affidavits show these three jurors "took it upon themselves to erroneously instruct the jury that the jurors were not supposed to focus on the crevice, but instead on the perimeter roadway as a whole."  In support, they cite comments in two juror affidavits indicating Quiles told jurors they were "not focusing on the right thing.  She told us that the point was that we were supposed to decide whether the roadway was dangerous, not just whether the crevice was dangerous."  The Ruttans contend "[s]uch misconduct is clearly a violation of the court's instruction with regard to the law and the evidence presented."

   The Ruttans brief does not explain which court instruction Quiles allegedly violated, or why it was improper for the jury to consider the entire road when determining if the crack constituted a dangerous condition.  Additionally, the Ruttans do not cite any legal authority in support of this argument.  "'Appellate briefs must provide argument and legal authority for the positions taken. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived."' [Citation.]  'We are not bound to develop appellants' argument for them. [Citation.]'  The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived." (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956.)  The Ruttans's conclusory assertion that Quiles's

statements to the jury "clearly . . . violat[ed] the court's instruction with regard to the law and the evidence presented" does not qualify as "reasoned argument." (*Ibid*.)**12**

### D. The Jury Verdict Is Supported by Substantial Evidence

The Ruttans argue they are entitled to a new trial because there was insufficient evidence to support the jury's finding that the crevice was not a dangerous condition. We review the trial court's ruling on the sufficiency and the weight of the evidence under the substantial evidence standard. (*People v. Lindsey* (1951) 105 Cal.App.2d 463, 465 [an order denying a motion for new trial "may be reversed on appeal only when there is a lack of substantial evidence to support the conclusion reached by the trial court"].) """[W]here there is evidence tending to support a verdict, we cannot disturb the verdict upon the ground it is not sustained by the evidence; and the application of this rule is strengthened in a case where, as here, the trial court has refused a new trial."""" (*People v. Whisner* (1950) 99 Cal.App.2d 845, 848; see also *People v. Westek* (1948) 31 Cal.2d 469, 473.)

As the appellant, the Ruttans had a duty to provide an adequate record permitting us to review their claim of insufficiency of the evidence. (See *Uribe, supra,* 41 Cal.3d at p. 574 ["a party challenging a judgment has the burden of showing reversible error by an adequate record"].) Although the Ruttans assert the only reasonable inference to be drawn from the evidence at trial was that the crevice qualified as a dangerous condition, they have not provided a copy of the trial transcript. Instead, they submitted an appellate

---

**12** In the same section of its brief, the Ruttans assert "the jurors also, contrary to the court's instructions, discussed Frederick's contributory negligence in carrying Freddie on his shoulders at the time of the accident." The brief cites to a single statement in an affidavit indicating the jurors discussed whether "having Freddie on [Frederick's] shoulders[] threw his center of gravity off." The Ruttans' brief does not explain which instruction the jury violated nor does it cite or discuss any legal authority regarding the "contributory negligence" issue. "The absence of cogent legal argument . . . allows this court to treat the contention[] as waived. [Citations.] We do so here." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)

31

appendix that includes selected portions of the transcript they believe support their claim. Generally, "an appellant who attacks a judgment but supplies no reporter's transcript will be precluded from raising an argument as to the sufficiency of the evidence." (*Estate of Fain* (1999) 75 Cal.App.4th 973, 992.) The Ruttans have provided no argument why we should not apply that rule here.

Moreover, portions of the trial transcript that the Ruttans chose to omit from their appendix (which were provided by the respondent through augmentation) demonstrate the City provided substantial evidence supporting the jury's finding that the crack in the zoo road was not a dangerous condition. Taryn Johnson, the City's safety expert, testified the crevice was not a dangerous condition, but rather a "typical condition" that would be expected to appear in any "asphalt installation." Johnson stated she did not believe the crack was dangerous because it was "clearly visible" and because thousands of people had traveled over the same portion of the road on a daily basis without any prior accident. Johnson also indicated she believed Frederick Ruttan's fall was caused by "his own inattention to the surrounding environment he was in." In support, she noted that Frederick had admitted he was looking at a display of cacti when he fell, rather than watching the road in front of him. Taryn also noted the Ruttans had admitted they frequently visited the zoo and were familiar with the roadway where the accident occurred. According to Johnson, these admissions showed the Ruttans knew, or should have known, the asphalt surface at the zoo was permeated by numerous cracks and crevices that were "typical conditions of any asphalt surface."

The Ruttans do not reference Johnson's testimony or offer any explanation why the jury was not entitled to credit her expert opinion. Instead, they argue that the following evidence demonstrates the crevice was a dangerous condition as a matter of law: (1) the crack was 18-30 inches long, between a half inch to four to six inches in width, and a half inch to two inches deep; (2) the zoo mason testified that the crevice needed to be repaired at the time of the accident; (3) the crevice was located on a roadway frequented by many people; (4) adults at the zoo frequently carried children on their shoulders. The Ruttans contend that "under these facts, no rational finder of fact

32

could reasonably conclude that the crevice was not a dangerous condition under California law." They further contend that "California cases uniformly hold that, when a depression or crevice begins to stretch beyond one inch, courts are reluctant to find that the defect is not dangerous as a matter of law."

At most, the evidence and case law the Ruttans cite suggest it might have been improper for the trial court to declare, as a matter of law, that the crevice at issue here was not a dangerous condition. This evidence and case law does not, however, establish as a matter of law that the crevice was in fact a dangerous condition.

## DISPOSITION

The judgment is affirmed. Respondent shall recover its costs on appeal.


ZELON, J.

We concur:



PERLUSS, P. J.



WOODS, J.


33