Filed 10/29/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| DANIEL MONTOYA et al., | B237495 |
| Plaintiffs and Respondents, | (Los Angeles County Super. Ct. No. GC040751) |
| v. | |
| ALFONSO BARRAGAN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, C. Edward Simpson, Judge.  Affirmed.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson; McCurdy & Liebl and John McCurdy for Defendant and Appellant.

The Cifarelli Law Firm, Philip C. Cifarelli, Krysta M. Sebastian; Thomas Beck Vanni Callahan & Powell and Daniel Powell for Plaintiffs and Respondents.

_____

Dr. Alfonso Barragan appeals the trial court's order granting plaintiffs' new trial motion on the ground of insufficiency of the evidence of causation and irregularity in the proceedings. Plaintiffs Daniel Montoya, Moises Montoya, Saul Montoya and Antonio Montoya (plaintiffs) are the family of decedent Olivia Montoya (Montoya), who died while in Dr. Barragan's care. After their complaint for wrongful death and survival went to trial before a jury, the court declared a mistrial when the jury was unable to return a verdict. The court polled the jury, and entered judgment for Dr. Barragan. Plaintiffs moved for a new trial based on (1) insufficiency of the evidence that Dr. Barragan did not cause Montoya's death, and (2) the court's error in entering judgment on the jury poll because the jury never returned a verdict. The trial court granted plaintiffs' motion on the grounds of insufficiency of the evidence of causation.

Dr. Barragan contends on appeal that the trial court's statement of reasons in its new trial order did not comply with Code of Civil Procedure section 657;[1] there is no evidence he caused Montoya's death; and the trial court properly entered judgment in his favor although the jury never returned a written verdict. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Summary of the Case

Montoya arrived at the Monterey Park Hospital emergency room with severe diarrhea on the morning of February 26, 2007. Montoya had recently undergone a hysterectomy while in the care of Dr. Mary Romo, after which Dr. Romo prescribed the antibiotic clindamycin, which can cause antibiotic-associated diarrhea. At the emergency room, Dr. Barragan assumed responsibility for Montoya's care, and diagnosed pseudomembraneous entero colitis. Pseudomembraneous colitis is a condition that can be caused by a bacteria known as "Clostridium Difficile" (C.Diff.). C.Diff. exists in the colons of a small percentage of the population and can proliferate when antibiotics kill off the other resident bacteria in the colon.

---

[1] All statutory references are to the Code of Civil Procedure unless otherwise indicated.

2

C.Diff. gives off toxins that attack the lining of the colon. The proper antibiotics, however, do not remove the toxins already present caused by the bacteria.

However, rather than promptly administer antibiotics to treat the condition, Dr. Barragan delayed doing so while he waited for lab results and stool cultures because he was concerned with worsening Montoya's condition by using the wrong antibiotics. Montoya's condition, which included severe dehydration and kidney failure, progressively worsened so that even after antibiotics were administered, it was too late to help her and she died on February 28, 2007.

Plaintiff's decedents commenced this action for wrongful death and survival on April 30, 2008 against Dr. Romo, Dr. Barragan, and others. The case went to trial on April 12, 2011 against Dr. Romo and Dr. Barragan only.[2] Dr. Barragan asserts that at the time Montoya arrived in the emergency room, based upon Dr. Romo's prescription of clindamycin and Montoya's resultant diarrhea, she was already past the point where medical intervention would have saved her, and thus plaintiffs cannot establish causation. Plaintiffs refute this assertion, and argue that had Dr. Barragan immediately given Montoya the proper antibiotics, she would have made a full recovery.

**B.      Trial Evidence**

*1.        Montoya's Initial Gynecological Surgery*

Montoya, who was 46, was referred to Dr. Romo, a gynecologist, in January 2007 for irregular vaginal bleeding. Dr. Romo performed a dilation and curettage (D&C). Although the D&C was uneventful, it did not stop Montoya's bleeding. Dr. Romo determined a hysterectomy would address the problem, and peformed a hysterectomy on Montoya on February 9, 2007.

Dr. Romo tore a glove during the surgery, although this incident was not in her surgical report. Post-surgery, she prescribed clindamycin for Montoya to avoid infection. Montoya's last dose of clindamycin was February 12, 2007, and she was discharged from the

---

[2] Dr. Romo is not a party to this appeal.

3

hospital on February 13, 2007.  At the time, Montoya did not have diarrhea or any other symptoms of illness.

### 2. *Montoya Presents with Diarrhea and Vomiting*

On Saturday, February 24, 2007, Dr. Romo saw Montoya, who complained of diarrhea.  Diarrhea can also be caused by C.Diff., which Dr. Romo knew can evidence the serious condition pseudomembraneous colitis.  Treatment for a C.Diff. infection includes hydration and dosing with vancomycin or Flagyl.  Dr. Romo told Montoya that if her condition did not improve, she should go to the emergency room.

### 3. *Montoya's Visit to La Libertad Clinic*

On Sunday February 25, 2007, Montoya went to the La Libertad Clinic.  Montoya said she was feeling better and received a liter and a half of fluid through an IV at the clinic, as well as Rocephin, an antibiotic.  Rocephin can create an environment in which C.Diff. can overgrow.

### 4. *Montoya's Emergency Room Visit*

On February 26, 2007 in the morning, Montoya called Dr. Romo.  Montoya was breathing heavily and told Dr. Romo over the weekend she had gone to the clinic and gotten some more medication for her diarrhea.  However, Montoya had nonstop diarrhea.  Dr. Romo directed Montoya to go the emergency room, believing that Montoya was infected with C. Diff. and had pseudomembraneous colitis.

Montoya arrived at the emergency room at about 9:45 a.m.  When Dr. Romo arrived, Montoya was very pale but alert and able to communicate.  Montoya was breathing very fast and was very cold; she appeared to be septic and had low blood pressure.  As Montoya was likely a candidate for the ICU, Dr. Romo was not permitted to take over her care, and Dr. Barragan admitted Montoya to the hospital.

### 5. *Dr. Barragan's Examination of Montoya*

Dr. Barragan was designated as Montoya's treating and admitting physician.  At 10:30 a.m., he noted that Montoya's chart disclosed that she had a temperature of 95.6, which was below normal, with a pulse of 120, twice normal.  Montoya's blood pressure was 60/40,

4

which was significantly low indicating that Montoya was in shock. Although Dr. Romo had wanted to insert a "central line" (a type of IV)[3] into Montoya to address her severe dehydration when Montoya arrived at the emergency room, this procedure was not done until 11:07 p.m.

Dr. Barragan noted that Montoya's patient history disclosed that approximately five days before, she had experienced colicky foul-smelling diarrhea, but had improved with the administration of fluids. Dr. Barragan noted that Montoya had received clindamycin in connection with her recent hysterectomy. Dr. Barragan was aware that clindamycin could kill the normal bacterial flora in the colon. Montoya's creatinine level was high, indicating kidney problems.

Dr. Barragan's physical examination revealed that Montoya was in hypovolemic shock (low blood volume which was insufficient to keep her blood pressure up) as a result of severe diarrhea. Dr. Barragan's diagnosis was infectious gastroenteritis, most likely pseudomembraneous colitis. For treatment, Dr. Barragan prescribed rapid infusion of fluids, lab work and stool culture, a colonoscopy and a consult with a gastroenterologist. Dr. Barragan proposed holding off on antibiotics until the diagnosis was confirmed.

Dr. Barragan moved Montoya to the definitive observation unit (DOU), where she would receive more monitoring.

Dr. Barragan was aware that if a patient has pseudomembraneous colitis caused by C.Diff., the bacteria is producing a toxin that attacks the surface inside the colon. The surface inside of the colon becomes necrotic and looks like a membrane. The antibiotics used to treat this condition include vancomycin or Flagyl. However, Dr. Barragan did not administer these medications immediately because Montoya's condition had initially been caused by antibiotics and he did not want to give her antibiotics that would aggravate the condition; furthermore, he believed Montoya was not dying of infection, but dying of shock. In order for antibiotics to

---

[3] A central venous pressure line is an intravenous tube that is placed in through the chest or the neck and threaded into the heart. It functions as an IV and as a measuring device.

work, the circulatory system must be effective. Dr. Barragan gave Montoya Donnatal, which stops cramping from diarrhea; however, Donnatal slows the muscles in the intestine so the body cannot get rid of toxins.

When Dr. Barragan first examined Montoya, he believed she would not survive. However, because of her age and overall good health he was hoping he could reverse her state of shock and address the underlying cause of her illness.

6. *Montoya's Colonoscopy*

Dr. Barragan wanted to obtain the results of a colonoscopy to ascertain whether Montoya had pseudomembraneous colitis, or whether her symptoms had another cause. Dr. Barragan placed an order for a colonoscopy in Montoya's chart and was told it was done. Dr. Fernando Ibarra was to perform the colonoscopy, but he never received notification, although he was on the premises that day. Dr. Barragan considered calling Dr. Ibarra directly, but did not do so.

Later in the afternoon Dr. Barragan learned that Montoya did not have a colonoscopy. Dr. Barragan went home for the day. Dr. Barragan also ordered an infectious disease consultation. At approximately 1:30 a.m. on February 27, 2007, Montoya received a second dose of Donnatal.

When Dr. Barragan returned at 9:00 a.m. or 10:00 a.m. the next day, he learned the colonoscopy still had not been performed. At this time, Montoya was in the intensive care unit. That morning Dr. Ibarra began a colonoscopy on Montoya, but terminated the procedure because Montoya was unstable and her oxygen level was low. Dr. Ibarra inserted a rectal tube and administered Flagyl.

Dr. Barragan considered performing a colectomy (removal of the colon), but concluded Montoya's blood pressure was too low for anesthesia, and he believed she would die in surgery. Montoya continued to deteriorate and died at 4:31 a.m. on February 28, 2007 of pseudomembraneous colitis.

## C.     Expert Opinions at Trial

Dr. Leo Gordon, a gastrointestinal expert, testified as an expert on behalf of Montoya that Dr. Barragan breached the standard of care.  In his opinion, there was a failure to surgically treat Montoya's condition.  Montoya presented to the emergency room with a rapid heart rate, low blood pressure of 60/40, and a white cell count with a high concentration of immature cells.  Dr. Gordon noted that Montoya had been given two antibiotics, in particular clindamycin, and developed diarrhea.  Montoya's dehydration resulted in a loss of kidney function (azotemia) because the loss of fluids kept her body from pumping blood to the kidneys.

With pseudomembraneous colitis, the lining of the colon becomes severely inflamed, causing profuse diarrhea which drains the body of necessary fluids.  Pseudomembraneous colitis also causes the wall of the colon to become permeable, permitting bacteria to enter the bloodstream.  The only hope for the patient in this case is a colectomy.  Otherwise, the patient will go into shock and die from sepsis, which is severe infection.  Dr. Gordon did not agree with Dr. Barragan's evaluation that Montoya was too ill to tolerate a colectomy, and opined that Montoya had a 24-hour window during which her colon should have been removed.

Dr. Harvey Brown testified as an expert in critical care on behalf of Montoya that Dr. Barragan's treatment of Montoya fell below the standard of care:  Dr. Barragan did not immediately order any antibiotics although Dr. Barragan suspected pseudomembraneous colitis; instead, Dr. Barragan waited for a colonoscopy to confirm the diagnosis.  Dr. Brown explained that when a patient presents with sepsis, the doctor should not wait for cultures or the results of a colonoscopy; thus, antibiotics should not have been withheld from Montoya during this time period.  In Dr. Brown's opinion, Montoya's condition was treatable when she arrived in the emergency room.

Dr. Douglas Cable, an infectious disease expert testifying for Montoya, opined that Montoya's pseudomembraneous colitis was most likely caused by the clindamycin Dr. Romo gave her.  Clindamycin is only indicated as a prophylactic where the patient has a history of sensitivity to penicillin.  Studies have shown that the mortality rate for C.Diff. infections is

34.7 percent; thus, if Montoya received appropriate antibiotics therapy, she would have recovered. The Donnatal (an anti-diarrhea medication that stops bowel contractions) that Dr. Barragan administered left the C.Diff. toxins in Montoya's system with nowhere to go. As a result, antibiotics were ineffective. In his opinion, Montoya had a serious infection when she arrived at the emergency room, but was not septic.

Dr. Alan Morganstein, Dr. Romo's infectious disease expert, testified that Montoya was in septic shock when she entered the emergency room and had a paralyzed bowel, which meant she would not absorb antibiotics. He opined that her low blood pressure was not consistent with life, but that she was salvageable until approximately 3:00 p.m. on the date of her admission with antibiotics, fluids, and blood pressure medication. However, had she received antibiotics upon presentation in the emergency room, she would have survived.

Dr. Kenneth Countryman, an expert in colorectal surgery, testified for Dr. Barragan that in his opinion, Dr. Barragan complied with the standard of care. Dr. Countryman testified that about five percent of the population has C.Diff. in their intestines. A potent antibiotic will kill off the normal intestinal organisms permitting C.Diff. to proliferate. Antibiotics take 12 to 18 hours to work, and have no effect on the toxins produced by the bacteria. In his opinion, although Dr. Barragan complied with the standard of care, he believed Dr. Barragan should have done more to get the colonoscopy sooner, or checked to see it had been done. Further, in his opinion, Dr. Barragan could rely on the nursing staff to complete his order for a colonoscopy. Montoya was not a candidate for bowel surgery.

Dr. James Leo, board certified in internal medicine, testified on behalf of Dr. Barragan and opined that that when Montoya was admitted to the emergency room, it was more likely than not she was going to die. Montoya was septic, she had acute kidney failure, profoundly low blood pressure of 60/40, and lactacidosis. Lactacidosis occurs when not enough oxygen gets to tissues and they produce lactic acid. Dr. Leo did not believe Montoya would have survived even if given antibiotics earlier. Further, he did not believe Montoya would have survived a colectomy because of her low blood pressure.

8

Dr. Irving Posalski, an infectious disease specialist, testified for Dr. Barragan that when Montoya arrived at the emergency room, she had all the clinical signs and symptoms of an illness that had been progressing for at least five days. She had septic shock and hypovolemic shock (insufficient circulating volume in the blood stream). At the time Montoya came to the emergency room, she had already developed organ failure. Dr. Posalski did not believe that even if Montoya had been given IV antibiotics upon her arrival at the emergency room she would have survived. Montoya contracted C.Diff.; when she received antibiotics after her surgery, the alteration in the bacteria in her gut allowed the C.Diff. to proliferate and make a toxin. When treating C.Diff, the antibiotics do not neutralize the toxins the bacteria have already made and do not reverse the damage to the colon. The toxins lead to septic shock syndrome.

### D. Jury Verdict and Motion for New Trial

#### 1. Jury Deliberations and Verdict

Jury deliberations took place on April 28, April 29, May 2 and May 3, 2011. The special verdict asked the jury to determine (1) whether Dr. Romo or Dr. Barragan were negligent, and if so, (2) whether the negligence of either doctor was a substantial factor in causing Montoya's death.[4] During deliberations, on April 29, 2011, the jury asked two questions. The jury sent a note asking, "Instruction on how to proceed in case of a divided jury. Also in regard to question #1, how do we proceed if we are decided on one defendant but not the other?" The court instructed the jury to continue deliberating, and to answer question one as to both defendants.

After resuming deliberations, the foreman informed the court that the jury was in agreement about Dr. Romo on question one, but was evenly divided on question two (six to six). The court instructed the jury to continue deliberating, and advised them that if they answered "no" to question one on either defendant, the verdict as to that defendant was complete and it was not necessary to answer the next question. If the jury's answer to

---

[4] The jury was instructed on substantial factor causation. The jury instructions are not part of the record.

question two was "no" as to a particular defendant, that also completed the verdict for that particular defendant.

The jury then asked how jurors who voted "no" on question one should approach question two. The court advised the jury that once it had answered question one, it should move on the question two, and that at least nine or more must agree on the answer to question two. The foreperson later advised the court that the jury had changed its vote on question one with regard to Dr. Romo (now eight to four). The foreman advised the court the jury would likely reach a conclusion on question one as to Dr. Romo, but not on question two because the issue was confusing. The foreman requested clarification of the import of a negative response to question one; the court advised that after the jury answered question one, even if the response was negative, the jury should look at question two again.

On May 3, 2011, after continuing deliberations, the jury informed the court it had not reached a verdict. The court advised the jury it intended to declare a mistrial, and declared a mistrial.

After declaring a mistrial, the court polled the jury. The jury was hung on the issue of Dr. Romo's negligence, but found she caused Montoya's injuries. The jury found Dr. Barragan negligent, but found that he was not the cause of Montoya's death, voting nine to three against finding causation with respect to Dr. Barragan.

### 2. *Dr. Barragan's Motion for Judgment on the Verdict*

Dr. Barragan moved for reconsideration of the order granting a mistrial, and requested judgment on the verdict or a directed verdict in his favor on the issue of causation. Dr. Barragan pointed out that the jury had found he was not the cause of harm suffered by Montoya. He also argued new facts warranted reconsideration of the court's mistrial grant because at the time the court found a mistrial, it had not polled the jury; the poll revealed that the jury had acquitted Dr. Barragan on the causation question. Alternatively, Dr. Barragan requested entry of judgment on the jury's verdict. In opposition, Montoya argued that the jury verdict was not in writing pursuant to section 618, and thus no judgment could be entered

10

thereon. Indeed, until a verdict was entered, the jury were still engaged in deliberations and were free to change their minds.

At the hearing, the court noted that it probably should have asked the jury to deliberate further on Dr. Barragan. The court stated that it erred in failing to reduce the verdict to writing. The court granted Dr. Barragan's motion for judgment on the verdict, and entered judgment for Dr. Barragan.

### 3. *Montoya's Motion for a New Trial*

Montoya moved for a new trial contending the weight of the evidence did not support a verdict in favor of Dr. Barragan, pointing to the testimony of Drs. Cable, Gordon, and Brown as establishing that Dr. Barragan's negligence was a substantial factor in causing Montoya's death and arguing this evidence was not strongly rebutted by Dr. Barragan's evidence. Further, irregularities in the proceedings existed because the entry of verdict in favor of Dr. Barragan was improper because there was no signed verdict. In opposition, Dr. Barragan argued that the weight of the evidence supported a finding of no causation based on the testimony of his expert witnesses that Montoya was already terminally ill when she presented at the emergency room, and nothing Dr. Barragan did could have or did change that result. Further, Montoya did not demonstrate prejudice because it was not likely the verdict would have changed if the court had ordered the jury to reduce the verdict to writing.

At the hearing, the court stated that "the jury found that Dr. Barragan was negligent. I think we're all stuck with that finding by the jury, with the caveat that I may not have correctly entered a verdict on it . . . . I don't know in the context of this case how a jury could find that Dr. Barragan was negligent but that his negligence then was not a factor in causing the injury. And I know we have the jury instructions on substantial factor that are somewhat, you know, confusing. . . . I'm just having a hard time reconciling—reconciling the verdict on negligence with the verdict that there was no causation."

The court granted the motion for a new trial. The court recited that Dr. Romo performed a D&C on Montoya; Dr. Romo prescribed clindamycin and Ancef as part of the procedure; Montoya experienced a severe adverse reaction; Montoya saw Dr. Romo on

11

February 24, 2007; Montoya went to La Libertad on February 25, 2007; and entered Monterey Park emergency room on February 26, 2007 where Dr. Barragan was called in to assess her condition. "She walked into the Emergency Room with normal blood pressure." The court found there was insufficient evidence to support a finding that Dr. Barragan's negligence was not a cause of Montoya's death. "[A]fter weighing all the evidence the Court is convinced that the jury clearly should have reached a different answer to the causation question. [¶] . . . [¶] . . . Dr. Barragan's negligence did not have to be the sole cause of injury. The Court acknowledges that the experts differed on whether Dr. Barragan's negligence caused Mrs. Montoya's death. After weighing that testimony, however, in light of the legal standard that his negligence need not be the only cause of injury, the Court is convinced that the jury's answer should have been different and a new trial is granted."

## DISCUSSION

Defendant contends that the trial court erred in granting a new trial to Montoya based upon insufficient evidence to establish that he was not a cause of her death. First, the trial court's specification of reasons is deficient both in failing to identify the reasons supporting its conclusions and set forth its reasoning and is based upon factual inaccuracies in its citation of evidence. Second, even without these deficiencies, the order granting a new trial erroneously concluded the jury erred in finding Dr. Barragan's decision not to perform a colectomy and his delay in ordering antibiotics evidenced causation on his part. Third, there was no irregularity in the proceedings or error in law, and the court should have entered judgment on the jury's findings. We conclude the trial court's grant of the new trial motion was proper based upon irregularity in the proceedings, and thus do not consider whether the evidence was sufficient to support a finding of causation against Dr. Barragan.

## I.     *Standard of Review and Sufficiency of Statement of Reasons*

### A.     **Legal Authority**

The authority of a trial court to grant a new trial is established and circumscribed by statute. "Section 657 sets out seven grounds for such a motion: (1) '[i]rregularity in the proceedings'; (2) '[m]isconduct of the jury'; (3) '[a]ccident or surprise'; (4) '[n]ewly

12

discovered evidence'; (5) '[e]xcessive or inadequate damages'; (6) '[i]nsufficiency of the evidence'; and (7) '[e]rror in law.'" (*Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633.)

Section 657 requires the trial court to "specify the ground or grounds upon which [a new trial] is granted and the court's reason or reasons for granting the new trial upon each ground stated." The requirement of a written statement of reasons encourages careful deliberation by the trial court and creates an adequate record for appellate review. (*Hasson v. Ford Motor Co.* (1982) 32 Cal.3d 388, 420; *Twedt v. Franklin* (2003) 109 Cal.App.4th 413, 419.) If the ground for a new trial concerns insufficiency of the evidence, the trial court must briefly recite the respect in which the evidence is inadequate, and identify the evidence that convinces the court that the jury should have reached a different verdict. (*Mercer v. Perez* (1968) 68 Cal.2d 104, 116.) The content of a specification of reasons will necessarily vary according to the circumstances of each case. (*Stevens v. Parke, Davis & Co.* (1973) 9 Cal.3d 51, 60.)

"It is helpful if the court declares what witnesses it believed, what testimony was to be disregarded or the value of any impeachment." (*Bigboy v. County of San Diego* (1984) 154 Cal.App.3d 397, 404.) Nonetheless, a trial judge does not need to specifically cite pages, lines in testimony, or extensively describe a witness's testimony in a fully compliant order. (*Scala v. Jerry Witt & Sons, Inc.* (1970) 3 Cal.3d 359, 370.) Nor must the judge write a statement of reasons that states the weight and inferences to be drawn from "'each item of evidence supporting, or impeaching, the judgment.'" (*Ibid.*) "Negligence, whether of the defendant or of the plaintiff, is a complex issue requiring for its resolution the determination of the existence or nonexistence of a variety of different elements, including the standard of due care, foreseeability of risk, duty to the person injured, breach of that duty, cause in fact, and proximate cause. To state that a party 'was not negligent' does not identify which one or more of the foregoing elements the adversary failed to prove by a preponderance of the evidence; and to state that a party 'was negligent' does not identify which of his acts or omissions deviated so far from the conduct of an ordinarily prudent person as to warrant that

condemnation. Indeed, it borders on the tautological to 'specify' that a new trial is granted on the ground of the insufficiency of the evidence to justify the verdict finding the defendant negligent because that evidence fails to show the defendant was negligent. Such a 'reason' simply reiterates the ground of the ruling itself." (*Id*. at pp. 366–367, italics omitted.)

In *Romero v. Riggs* (1994) 24 Cal.App.4th 117, the jury found that defendant optometrist had been negligent, but that such negligence did not cause plaintiff's vision loss. The trial court granted a new trial because it disagreed with the verdict regarding causation, and issued a brief statement of reasons stating that "'overwhelming evidence'" established that defendant's failure to diagnose and treat plaintiff's glaucoma caused his vision loss. (*Id*. at p. 121.) The reviewing court concluded that the specification of reasons was adequate because it was "fully adequate both to guide our review and to supply a substantial basis for the order." (*Id*. at p. 124.)

The procedural requirements must be strictly followed with respect to sufficiency of the evidence arguments. (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 905.) As explained in *Oakland Raiders*, *supra*, 41 Cal.4th 624, "When the trial court provides a statement of reasons as required by section 657, the appropriate standard of judicial review is one that defers to the trial court's resolution of conflicts in the evidence and inquires only whether the court's decision was an abuse of discretion. [Citations.] But when there is no statement of reasons, an appellate court's use of an abuse of discretion standard of review would subvert the purposes that this court has identified as underlying section 657's statement of reasons requirement." (*Id*. at p. 636.) Where the statement of reasons is inadequate, we independently review the trial court's order granting a new trial. (*Id*. at p. 640.)

**B.     Discussion**

Defendant argues that the trial court's specification of reasons is deficient because it does not refer to any evidence it believed was insufficient to support the jury's verdict, and fails to specify the portion of the record on which the decision was based. At most, it acknowledges that the experts disagreed on whether Dr. Barragan's negligence caused Montoya's death, but this was insufficient because it did not identify the criticized evidence.

14

Defendant argues that the specification of reasons contains no reasons other than to state that the trial court weighed the evidence and reached a different conclusion than the jury. Further, defendant contends the specification of reasons is based on a factual error by the court because it states that Montoya walked into the emergency room with normal blood pressure at 60 over 40, but each witness who testified stated that such a blood pressure was dangerously low and inconsistent with life (e.g., Drs. Gordon, Brown, and Morganstein).[5] The trial court's statement is also incorrect in that it misstates the date of Montoya's D&C as February 9, 2007 (it was January 12, 2007) and she did not receive clindamycin on February 9 but on February 10, 2007 following her hysterectomy.

We find the trial court's statement of reasons sufficient. Given that the case rested entirely on the conflicting testimony of numerous experts in the relevant areas of internal medicine, gastroenterology, surgery, and infectious diseases and was a complex case requiring the jury to sort out the negligence of two different doctors, we cannot say the trial court's reasons were deficient. Although the court could have pointed to the specific expert doctors' testimony upon which it relied in concluding that Dr. Barragan's negligence was a substantial factor, the court isolated the precise issue upon which it based its rationale and pointed out that the conflicting expert evidence left it to conclude that it could not rule out that Dr. Barragan's negligence caused Montoya's death. (See *Romero v. Riggs*, *supra*, 24 Cal.App.4th at p. 124 [where trial court's statement of reasons directs appellate court's attention to the aspects of the record which support the order, such reasons are sufficient where reasonable basis in the record for trial judge's decision].)

Furthermore, the mistakes in the trial court's statement (the date of Montoya's hysterectomy and its statement that Montoya's blood pressure was normal on her admission to the emergency room) do not undermine the trial court's conclusions, which were based on its assessment of the totality of the evidence presented at trial, that there was sufficient evidence that Dr. Barragan's failure to administer antibiotics, ensure a colonoscopy was performed to

---

[5] Dr. Alan Morganstein testified for Dr. Romo.

diagnose pseudomembraneous colitis, and if necessary perform a colectomy caused Montoya's death.

## II.    *Irregularity of Proceedings*

Dr. Barragan contends that the jury's failure to enter a written verdict did not constitute an irregularity in the proceedings; he contends that on the contrary, the polling of the jury indicated that it found in Dr. Barragan's favor. Further, plaintiffs are not prejudiced because they have not established that the jury's actual verdict would have been different had it been reduced to writing.

A new trial may be granted where there is an "[i]rregularity in the proceedings." (§ 657, subd. (1).) An "irregularity of the proceedings" is a catch-all phrase referring to any act that (1) violates the right of a party to a fair trial and (2) which a party "cannot fully present by exceptions taken during the progress of the trial, and which must therefore appear by affidavits." (*Gay v. Torrance* (1904) 145 Cal. 144, 149; accord *Gibbons v. Los Angeles Biltmore Hotel* (1963) 217 Cal.App.2d 782, 791.)

Section 618 provides, "[w]hen the jury, or three-fourths of them, have agreed upon a verdict, they must be conducted into court and the verdict rendered by their foreperson. *The verdict must be in writing*, signed by the foreperson, and must be read to the jury by the clerk, and the inquiry made whether it is their verdict. Either party may require the jury to be polled, which is done by the court or clerk, asking each juror if it is the juror's verdict. If upon inquiry or polling, more than one-fourth of the jurors disagree thereto, the jury must be sent out again, but if no disagreement is expressed, the verdict is complete and the jury discharged from the case." (Italics added.)

"The polling process [described in section 618] is designed to reveal mistakes in the written verdict or to show 'that one or more jurors [agreed] to [the] verdict in the jury room[,] but [is] unwilling to stand by it in open court." (*Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 256.) "[A] juror may change his or her vote at the time of such polling" "until the . . . verdict [is] recorded," and may declare at the last minute that such verdict is not the verdict of that juror. (*Id.* at pp. 256–257.) A juror may not change their vote if

16

the change is the result of a misunderstanding of the legal effect of his or her verdict. (*Id.* at p. 256.)

If the written verdict is inconsistent, incomplete, or insufficient, the judge must either question the foreman, return the verdict form to the foreman for correction, or send the jury back for further deliberations. (*Mizel v. City of Santa Monica* (2001) 93 Cal.App.4th 1059, 1069–1070.) The party adversely affected by an ambiguous or incomplete verdict must ask the trial judge to obtain a more certain verdict before the jury is discharged. (*Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456.)

Here, however, there was no written verdict—the jury returned no signed verdict in conformity with section 618. Rather, the court took a poll to determine how the jurors voted; such a vote does not constitute a verdict. Thus, the court's entry of judgment for Dr. Barragan where no verdict had been returned constituted an irregularity in the proceedings. As a result, the trial court's grant of a new trial to Montoya on this ground was proper.

## DISPOSITION

The order granting a new trial is affirmed. Respondent is to recover costs on appeal.

CERTIFIED FOR PUBLICATION.


JOHNSON, J.


We concur:


MALLANO, P. J.


ROTHSCHILD, J.


17