Filed 1/22/16  Jones v. Cooke CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| HIRAM JONES, et al., | D068684 |
| Plaintiffs and Appellants, | |
| v. | (Super. Ct. No. CIVBS1100056 ) |
| WILLIAM COOKE, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Bernardino, Brian S. McCarville, Judge.  Affirmed in part; reversed in part; remanded with directions.

The Arkin Law Firm, Sharon J. Arkin; The Blackman Law Firm and April R. Blackman for Plaintiffs and Appellants.

Law Offices of Kim L. Bensen, Eric W. Bladh; Pollak, Vida & Fisher, Michael M. Pollak and Anna L. Birenbaum for Defendant and Respondent.

Hiram and Karen Jones appeal a judgment entered on a jury's special verdict following a trial on their complaint for personal injuries arising from a traffic collision. William Cooke admitted liability, and following a trial on damages, the jury found

Cooke's negligence was a substantial factor in causing the Joneses' harm but that Hiram had suffered no damages on his claims for future medical expenses and future pain and suffering and Karen had suffered no damages on her claims of past and future pain and suffering. The Joneses contend: (1) the jury's award of zero damages with respect to Karen's noneconomic damages was inadequate as a matter of law; (2) the trial court erred by denying their motion for new trial based on juror misconduct; and (3) the trial court erred by denying their motion for new trial based on judicial misconduct.

We conclude, based on the unique facts of this case, that the jury's award of no damages for Karen's pain and suffering was inadequate as a matter of law. However, we determine that the trial court did not err in denying the Joneses' motion for new trial based on juror or judicial misconduct. We therefore affirm in part and reverse in part the judgment and remand with directions to retry the case as to Karen's noneconomic damages only.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

This case arises out of a car accident when Cooke's sport utility vehicle collided with the left rear corner of the Joneses' car on March 1, 2009. Hiram exited his car immediately after the impact. Karen exited the car about 10 minutes later, after the California Highway Patrol arrived on the scene. Both Hiram and Karen denied requiring medical assistance. The Joneses and Cooke were able to drive their cars away from the

---

[1] Because of the limited issues before us, we focus our discussion of the facts on evidence of Karen's pain and suffering as well as the claims of juror and judicial misconduct.

2

scene, but the Joneses had to maintain their car's speed at no more than 40-45 miles per hour.

On February 2, 2011, the Joneses filed the instant action. Trial began September 16, 2013.

At trial, Hiram testified to the injuries he attributed to the collision: Pain in his left arm, neck, lower back. and hips. A few weeks before the collision, Hiram had undergone nerve repair surgery on his left arm and striking the left door panel in the crash triggered further pain and swelling in that arm. Hiram saw his personal physician the day following his accident and was referred for evaluation. He underwent physical therapy, hot and cold treatments, electronic stimulation therapy, and home exercises for the pain in his back and hips. At the time of trial, Hiram stated that he was continuing to do the home exercises.

Hiram's left arm and neck pain resolved within a few weeks of the accident, but at the time of trial, he testified that he was still suffering from on-going back pain. He also testified that he still experienced hip pain, which woke him up at night and limited his ability to move, walk, ride his motorcycle, or work with the horses he was raising as his occupation during retirement. Additionally, he said that although he had experienced hip pain in the past that would resolve, since the March 1, 2009 accident, his hip pain had been persistent.[2]

---

2    Although he had previously had problems with his hips before the March 1, 2009 accident, including soreness after a previous car accident on December 25, 2008, Hiram

The Joneses' medical expert, Dr. Max Matos, opined that Hiram's on-going hip and back pain were caused by the March 1, 2009 accident. Cooke's medical expert, Dr. Kambiz Hannani, disagreed and opined that Hiram's hip pain resulted from bursitis, and was likely caused by walking, biking, or running. Also, as to Hiram's back injury, Dr. Hannani testified that a back injury, including muscle strain, is possible from an accident like the subject one, but that Hiram's medical records did not mention back pain following the accident, which indicated that Hiram did not sustain any injury to his back as a result of the March 1, 2009 accident.

At trial, Karen testified that when the March 1, 2009 collision occurred, she was sitting on the edge of the passenger seat, looking at the car's owner's manual. The impact felt like being hit by a tank, and she twisted and slammed into the door and then went forward. Her knees hit the dash, her side hit the door, and her cheek hit the window. At the scene, she had both back and side pain.

When Karen and Hiram returned home after the March 1, 2009 accident, Karen discovered that she was bleeding from her rectum, took a shower, and had her husband take her to the emergency room. At the emergency room, she was x-rayed and had a urine test and a rectal test to check for blood.

After following up with her family doctor, Karen had to undergo a colonoscopy and endoscopy to rule out complications from the accident and the resulting rectal

---

testified that the pain was only occasional and always resolved quickly until the March 1, 2009 accident.

bleeding.[3] Because of her back pain, she was referred for, and attended, 10 weeks of physical therapy (including heat and cold treatment) and did home exercises. Unfortunately this treatment did not relieve her lower back pain.

Because of her work obligations, the first week after the accident Karen worked without taking any pain medication and suffered extreme pain; even driving to work was painful. She felt that she could not take any time off work.

The bruising and soreness in Karen's knees from the March 1, 2009 accident resolved within a few weeks, but the lower back pain proved resistant to treatment. At the time of trial, she stated that she remained in constant pain despite three rounds of epidural shots into her spine. She admitted the final epidural shot did reduce her pain, for about six months, but the pain eventually returned.

Karen also explained that the lower back pain had severely restricted her activities, including preventing her from exercising on the treadmill as well as limiting her ability to garden, walk up stairs, and care for her husband's horses.

Dr. Matos testified that an MRI of Karen's back showed that Karen had degenerative conditions, but she was asymptomatic before the March 1, 2009 accident. He testified that this accident took a dormant back condition and made it painful, which could require surgery. He described Karen's lower back pain as a "symptomatic chronic

---

[3] There was conflicting evidence regarding Karen's rectal bleeding as to when she first noticed that she was bleeding. After the March 1, 2009 accident, she was diagnosed with internal hemorrhoids and diverticulitis.

condition" that needs to be managed through various pain controlling medications and exercises.

Cooke's expert witness, Dr. Hannani, testified that the source of Karen's back pain was caused by the March 1, 2009 accident as well as the previous December 25, 2008 accident. Dr. Hannani agreed with Dr. Matos that Karen's pain would be a lifelong affliction, opining it was "[u]nlikely she will have significant improvement on her pain based on time[.]"[4]

At the conclusion of trial, the jury rendered a special verdict. It found that Cooke's negligence was a substantial factor in causing harm to the Joneses. It further found Hiram had suffered economic damages in the amount of $1,081 and noneconomic damages in the amount of $1,000. The jury also found that Karen had suffered economic damages of $6,533, but did not award her any noneconomic damages. Because the amount of damages the jury awarded was less than the statutory offers of judgments under Code of Civil Procedure section 998 Cooke had made both Karen and Hiram, the trial court entered judgment in Cooke's favor in the amount of $13,792.94 as the difference between Cooke's costs and the jury's award to the Joneses.

The Joneses subsequently filed a notice of intent to move for a new trial, or in the alternative a motion for modification of the judgment and motion for judgment

_____

[4]    The Joneses presented evidence regarding the cost of the medical care and future medical care and treatments that they asserted were attributable to the March 1, 2009 accident. The jury awarded them economic damages at least in part for the medical treatment of their injuries after the accident. Because the Joneses do not challenge the jury's verdict as to the award for economic damages (outside the issues of juror and judicial misconduct), we do not discuss this evidence further.

6

notwithstanding the verdict. The Joneses sought a new trial on five grounds: irregularity in the proceedings based on judicial misconduct; jury misconduct; inadequate damages; insufficiency of the evidence to justify the verdict; and error in law. Cooke opposed the motion and objected to certain evidence offered by the Joneses.

After considering the pleadings and evidence as well as hearing oral argument, the court denied the Joneses' motion for a new trial.

The Joneses timely appealed.

DISCUSSION

I

*KAREN'S NONECONOMIC DAMAGES*

The trial court denied the Joneses' motion for new trial as to Karen's claim that her noneconomic damages were inadequate as a matter of law, noting: "And the issues were not uncontested with respect to damages and causation. They were brought out, the issues, during [defense counsel's] cross-examination of both the plaintiffs and the medical experts, or expert, that to testify as to the nature and the extent of the injury and the need for past treatment and future treatment."

The Joneses argue the trial court erred, contending "the evidence was undisputed and uncontradicted that the collision caused Karen's back pain and that she will suffer with it for the rest of her life." The Joneses claim the trial court erred because the jury's refusal to award Karen pain and suffering damages was misconduct. Cooke takes issue with the Joneses' label of this error as juror misconduct, but this disagreement is not of the moment. Instead, we review this issue to ascertain if the jury's failure to award

7

noneconomic damages as to Karen was inadequate as a matter of law and therefore the court abused its discretion by not ordering a new trial. (See, e.g., *Dodson v. J. Pacific, Inc.* (2007) 154 Cal.App.4th 931, 938 (*Dodson*).)

The amount of damages to be awarded is a question of fact for the jury to decide in the first instance. (*Seffert v. Los Angeles Transit Lines* (1961) 56 Cal.2d 498, 506; *Miller v. San Diego Gas & Electric Co.* (1963) 212 Cal.App.2d 555, 558 (*Miller*).) On a new trial motion challenging the adequacy of the damages awarded, the trial court sits as a thirteenth juror with the power to weigh the evidence and judge the credibility of the witnesses. (*Seffert*, *supra*, at p. 507; *Boeken v. Philip Morris, Inc.* (2005) 127 Cal.App.4th 1640, 1689; see Code Civ. Proc., § 657 ["A new trial shall not be granted upon the ground of . . . excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."].)

" 'Whether the contention is that the damages fixed by the jury are too high or too low, the determination of that question rests largely in the discretion of the trial judge. The appellate court has not seen or heard the witnesses, and has no power to pass upon their credibility. Normally, the appellate court has no power to interfere except when the facts before it suggest passion, prejudice or corruption upon the part of the jury, or where the uncontradicted evidence demonstrates that the award is insufficient as a matter of law. In determining whether there has been an abuse of discretion, the facts on the issue of

8

damage most favorable to the respondent must be considered.' " (*Miller*, *supra*, 212 Cal.App.2d at pp. 558-559; see *Gersick v. Shilling* (1950) 97 Cal.App.2d 641, 645.)

Here, the jury determined that Cooke's negligence was a substantial factor in causing harm to Karen. The Joneses point out that the evidence adduced at trial was uncontroverted that Karen had experienced and will experience pain and suffering for the rest of her life. For example, Karen testified that she felt pain in her lower back right after the March 1, 2009 accident. She further testified that she was in constant pain at the time of the trial. Although physical therapy and other treatments lessened the pain for a period of time, Karen stated that the pain returned and has greatly impacted what she was able to do.

Dr. Matos testified that Karen experienced back pain immediately following the March 1, 2009 accident and continued to be in pain. He testified that Karen reported her pain to be constantly "dull to moderate" "rated as a three to a six on a scale of ten" and sometimes a "nine on a scale of ten when bending over at the waist." Dr. Matos opined that "[t]he pain and the need for treatment started with this accident" and Karen's pre-existing aging issues affecting her spine did not result in any pain for Karen prior to the March 1, 2009 accident. He described Karen's pain as a "symptomatic chronic condition" that needs to be managed through various pain controlling medications and exercises. Dr. Matos concluded: "In my opinion the accident, the injury, transformed a dormant condition into a painful condition and need for treatment and need for evaluation and maybe the need for surgery is due to what happened on 3-1-2009[.]"

Cooke's expert witness, Dr. Hannani, testified that the source of Karen's back pain was "a combination of" the December 25, 2008 and March 1, 2009 accidents. Thus, although Dr. Hannani identified another cause of Karen's back pain, he admitted that the March 1, 2009 accident contributed to her current pain. He also admitted that he did not have any reason to believe Karen was not being honest when he evaluated her, and he did not believe she was faking her injuries. Also, Dr. Hannani agreed with Dr. Matos that Karen's pain would be a lifelong affliction, opining it was "[u]nlikely she will have significant improvement on her pain based on time[.]"

During closing argument, Cooke's trial counsel seemed to concede that the evidence supported an award to Karen for at least past pain and suffering, telling the jury that he believed "$8,000 is a reasonable noneconomic loss, pain and suffering for her past injuries." He did, however, argue that Karen was not entitled to any damages for future pain and suffering because her "future injuries . . . are not caused by the [March 1, 2009] accident[.]"

We agree with the Joneses that the evidence at trial was uncontroverted. Karen experienced back pain after the March 1, 2009 accident. She received treatment for that pain, but her condition is chronic and is likely to continue for the rest of her life. At the very least, both medical experts agreed that the March 1, 2009 accident contributed to Karen's pain. And Cooke's trial counsel conceded in closing argument that Karen was entitled to past pain and suffering damages. Against this backdrop, we conclude that the jury's failure to award Karen any pain and suffering damages (for both past and future)

10

was inadequate as a matter of law. (See *Dodson*, *supra*, 154 Cal.App.4th at p. 938; *Miller*, *supra*, 212 Cal.App.2d at p. 558.)

Cooke attempts to distinguish *Dodson*, *supra*, 154 Cal.App.4th 931, on the grounds that in that case, the plaintiff had surgery, and here, Karen did not.[5] This fact does not sufficiently distinguish *Dodson* from the instant matter. In *Dodson*, the court noted:

> "[W]e know—because the jury expressly decided—that J. Pacific's negligence was a cause of Dodson's injury, and that Dodson suffered economic damages 'caused by the accident . . . .' We know that he underwent surgery in which a herniated disc was removed and replaced with a metallic plate. We know the jury awarded damages, at least in part, for Dodson's surgical expenses. A plaintiff who is subjected to a serious surgical procedure must necessarily have endured at least some pain and suffering in connection with the surgery. While the extent of the plaintiff's pain and suffering is for the jury to decide, common experience tells us it cannot be zero." (*Id*. at pp. 937-938, fns. omitted.)

Thus, the court noted that the fact that the plaintiff had surgery was evidence that he experienced pain and suffering in connection with the surgery. And the defendant's negligent act was the cause of the plaintiff needing surgery. This foundation led the court to conclude that the award of damages to the plaintiff was inadequate as a matter of law. (*Dodson*, *supra*, 154 Cal.App.4th at p. 938.) In other words, the court found that the

---

5    In addition, in response to the Joneses' argument that Karen was entitled to damages for pain and suffering, Cooke discusses and cites to portions of the record involving Hiram's injuries. This is a curious strategy when the argument only concerns Karen. No citations to the record refute that Karen experienced pain after the March 1, 2009 accident, was experiencing pain at the time of trial, and will continue to experience pain in the future. Further, Cooke does not address the fact that his own expert witness testified that the March 1, 2009 accident caused Karen injury and contributed to her pain and suffering.

11

plaintiff's surgery was sufficient, uncontroverted evidence on which damages for pain and suffering should have been awarded. However, evidence of surgery is not a necessary fact before pain and suffering damages can be awarded. Indeed, even Cooke acknowledges in his respondent's brief that we must evaluate each case on its specific facts. (See *id.* at p. 936 [" '[E]very case depends upon the facts involved.' "].) As we explain above, the evidence here clearly established that Karen experienced pain after the March 1, 2009 accident, was experiencing pain at the time of trial, and would continue to experience pain in the future. Additionally, both parties' respective experts agreed that this accident was at least part of the cause of Karen's back pain. Finally, the jury awarded Karen economic damages for her medical expenses arising out of the March 1, 2009 accident. The jury's failure to award Karen damages for her pain and suffering thus is inadequate as a matter of law.

Because the award of damages was inadequate as a matter of law, the denial of a new trial on the issue of Karen's damages was an abuse of the trial court's discretion.

II

*JUROR MISCONDUCT*

A trial court is authorized to grant a new trial on grounds of "[i]rregularity in the proceedings of the . . . jury . . . by which either party is prevented from having a fair trial" as well as "[m]isconduct of the jury." (Code Civ. Proc., § 657, subds. 1, 2; see *Oakland Raiders v. National Football League* (2007) 41 Cal.4th 624, 633; *Montoya v. Barragan* (2013) 220 Cal.App.4th 1215, 1227.)

12

We will not reverse a trial court's decision to deny a new trial alleging juror misconduct unless, on a review of the entire record, the court has abused its discretion. (*Sarti v. Salt Creek Ltd.* (2008) 167 Cal.App.4th 1187, 1213.)

When evaluating a new trial motion based on juror misconduct, the trial court undertakes a three-step process. (*Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345.) It must first " 'determine whether the affidavits supporting the motion are admissible. [Citation.]' [Citation.] This, like any issue of admissibility, we review for abuse of discretion. [Citation.] [¶] Second, 'If the evidence is admissible, the trial court must determine whether the facts establish misconduct. [Citation.]' [Citation.] 'The moving party bears the burden of establishing juror misconduct.' " (*Ibid.*) " ' "[W]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.]" ' [Citations.] [¶] ' "Lastly, assuming misconduct, the trial court must determine whether the misconduct was prejudicial." [Citation.]' [Citation.] On appeal, this court reviews the entire record, including the evidence, and makes an independent determination as to whether the misconduct was prejudicial." (*Ibid.*)

"Juror misconduct raises a presumption of prejudice, and unless the prevailing party rebuts the presumption by showing the misconduct was harmless, a new trial should be granted. [Citations.] This does not mean that every insignificant infraction of the rules by a juror calls for a new trial. Where the misconduct is of such trifling nature that it could not in the nature of things have prevented either party from having a fair trial, the verdict should not be set aside." (*Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th

13

499, 507.) Where it is reasonably probable that in the absence of misconduct the jury would have arrived at a different verdict, the moving party is entitled to a new trial. (*Id.* at p. 508.)

In support of their assertion of juror misconduct, the Joneses submitted two declarations from jurors Michael Fonseca and Michael Mendez. Cooke objected to the majority of both declarations on the grounds that statements concerning the states of mind, opinions, and conclusions of the jurors was inadmissible under Evidence Code section 1150, subdivision (a). The superior court sustained the objections to the declarations and stated that it would not consider them in ruling on the Joneses' motion for a new trial.

Here, the Joneses do not explain how the court erred in sustaining the objections to Mendez's declaration. Indeed, they do not address the substance of Mendez's declaration whatsoever. As such, we deem any challenge to the court's ruling on the admissibility of Mendez's declaration waived. (See *Nelson v. Avondale Homeowners Assn.* (2009) 172 Cal.App.4th 857, 862.)

The Joneses address Fonseca's declaration, but in doing so, concede much of the testimony in that declaration was inadmissible under Evidence Code section 1150, subdivision (a). Nevertheless, the Joneses insist that the portion of Fonseca's declaration wherein he refers to statements made by other jurors was admissible. They unfortunately fail to cite to any specific statements or page or line numbers to provide us with the precise statements at issue. Based on our reading of Fonseca's declaration, it appears the Joneses are referring to the following statement: "Almost immediately a conversation

14

took place among the jurors wherein it was stated that it was the horseback riding and the motorcycle riding, over the years, that cause [sic] back pain to both plaintiffs, rather than the accident in question."

The Joneses characterize this statement as "proof of an overt act, objectively ascertainable" and as such, admissible. (See *People v. Hutchinson* (1969) 71 Cal.2d 342, 349-350.) We disagree. The subject statement evidences the deliberative process of some of the jurors. The fact that a juror may have stated that the Joneses' injuries were caused by horseback or motorcycle riding indicates his or her evaluation of the evidence. There was evidence that Hiram rode motorcycles and horses. There was evidence that Karen rode on the back of Hiram's motorcycle. Nonetheless, the Joneses claim that there was no evidence presented that riding horses or motorcycles could cause their injuries. Therefore, they assert at least some of the jury relied on evidence that was not received at trial. Not so.

There is nothing in Fonseca's declaration that indicates the jury considered extraneous information. For example, there is no indication that any members of the jury considered outside evidence discussing the harm caused by horseback or motorcycle riding. Fonseca's declaration does not raise the possibility that any of the jurors concealed a bias during voir dire, received outside information, discussed the case with nonjurors, or shared improper information with other jurors. (See *In re Hamilton* (1999) 20 Cal.4th 273, 294.) Simply put, there is no evidence of juror misconduct. At most, the statement on which the Joneses rely intimates that some of the jury might have been confused by the evidence, but juror confusion based on evidence presented, especially

15

complicated medical evidence, does not equate to juror misconduct.  Instead, we conclude Fonseca's declaration contains similar information to what other courts have routinely excluded under Evidence Code section 1150, subdivision (a).  (See *Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1124-1125 [juror declarations are inadmissible as to the jurors' subjective reasoning process]; *English v. Lin* (1994) 26 Cal.App.4th 1358, 1367 [evidence of the jury's alleged subjective collective mental process as to how they determined the plaintiff's loss of earnings is inadmissible]; *Ford v. Bennacka* (1990) 226 Cal.App.3d 330, 335-336 [declarations showing jury confused the concepts of comparative fault and preponderance of the evidence inadmissible].)

Because we determine that the superior court did not err in sustaining Cooke's objections to Fonseca's declaration, there is no admissible evidence to establish juror misconduct.  Thus, we conclude the court did not abuse its discretion in denying the Joneses' motion for new trial based on juror misconduct.

III

*JUDICIAL MISCONDUCT*

The Joneses also claim the trial court erred in denying their motion for new trial based on judicial misconduct.  To this end, they claim the trial court did not pay attention during trial, giving the jury the impression that the case was not important and/or without merit.

"In conducting trials, judges ' "should be exceedingly discreet in what they say and do in the presence of a jury lest they seem to lean toward or lend their influence to one

16

side or the other." [Citation.]' [Citation.] Their conduct must ' " ' "accord with recognized principles of judicial decorum consistent with the presentation of a case in an atmosphere of fairness and impartiality[.]" ' " ' [Citation.] ' "The trial of a case should not only be fair in fact, . . . it should also appear to be fair." ' " (*Haluck v. Ricoh Electronics, Inc.* (2007) 151 Cal.App.4th 994, 1002.)

Here, the Joneses provide a list of the trial judge's conduct they deem problematic. For example, they are troubled with the trial court's explanation to the jury that he needed to multi-task during trial. Prior to trial, the trial judge informed the jury:

> "Now, I read an opinion the other day because all decisions that trial courts judges can sometimes be reviewed by appellate courts and I had something that I used to say and that is in addition to the job I am doing here in this case, I am certainly able to multi-task and I am sure you have seen me looking at my computer and what is coming up right now is text. Kathy has a program that she types into her machine and it comes up as text, it is called Realtime. You have also seen me working on other files. A case over here is a family law case I am getting ready to make a decision on and you will see me talking with Olivia from time to time and even Alfie may come up and see me. [¶] I am also the supervising judge here at the courthouse so sometimes one of the supervisors or managers or one of my fellow judges may come in with a question and you are thinking is he really paying attention? Yes, I am really paying attention in this case. I am not letting anything distract me from what my responsibilities are and what that appellate court case said in a criminal context was, well, how can you do that, judge? So I am kind of wary about telling you this, but I don't want you to be thinking about it because I think it is important that you know what I do and how I spend my time and how I am paying attention to this. [¶] You shouldn't consider whether I am writing fast and furious taking notes because not only can I take notes on paper, I can take notes on my computer and sometimes you will see me look at it if there is an objection and I will look down here. I am scrolling back to look at the context of the question. [¶] So understand what my responsibilities are and I am not playing Free Cell and I am not looking at the Internet and all the things that some people think

17

happen; maybe. But I am paying all the time I need with this case and the attorneys keep me in line, believe me, and you have seen that here, they have called things to my attention and I ruled on it."

Next, the Joneses claim that throughout the trial, the trial judge worked on other files, read the Daily Journal, and interrupted the proceedings with "loud driving directions from his computer[.]" However, on the record before us, it is difficult to ascertain to what extent, if any, the trial judge was not properly focused at trial, distracted the jury, or otherwise gave the jury the impression that the case was not important or without merit.

At the close of evidence, out of the presence of the jury, the following exchange took place between the Joneses' trial counsel and the trial judge:

> "[The Joneses' Attorney]: I would like to say something and I don't want to upset the court, but during some of my witness' testimony I noticed the court was reading a newspaper and then just now doing the economic, the non-economic damage part of the testimony, I don't know, I think MapQuest went off so - -
>
> "THE COURT: Just like your phone the other day?
>
> "[The Joneses' Attorney]: I know, but --
>
> "THE COURT: Yes. Be direct, Counsel. Something you should learn.
>
> "[The Joneses' Attorney]: Okay.
>
> "THE COURT: I was reading the Daily Journal. That is why I tell the jurors I am the supervising judge, remember that part of the discussion I had and I have other responsibilities?
>
> "[The Joneses' Attorney]: I know, but I thought you said it was something about you were concerned about --

18

"THE COURT: I am concerned about it, but I don't care. I said I was concerned because the Court of Appeal in a recent opinion said something about it and it is no, doesn't make any sense, I am going to do those things any way because I tell the jurors at the outset that my job is multi-tasking and I don't have to make any determinations as to economic or non-economic damages when it is a jury trial. That is their decision, that is why I don't spend time doing that, but go ahead.

"[The Joneses' Attorney]: Well, I just feel like it sort of signals to the jury that maybe you are not really listening to the evidence or maybe you don't think it is important and --

"THE COURT: That is why there is a jury instruction that we are going to give that says what I do you don't pay any attention to; that is one of our CACI instructions.

"[The Joneses' Attorney]: I am aware of that.

"THE COURT: Okay.

"[The Joneses' Attorney]: Okay.

"THE COURT: I understand your point, but that is why if it is a court trial it is one way, if it is a jury trial it is another.

"[The Joneses' Attorney]: Okay. [¶] Thank you.

"THE COURT: Anything else?

"[The Joneses' Attorney]: No."

Also, in support of their motion for a new trial, the Joneses submitted a declaration from their trial counsel wherein she declares that the trial "judge was reading the newspaper during the testimony of one of plaintiffs' witnesses. In addition during the plaintiff Karen Jones' testimony the judge was apparently online looking for directions somewhere, because suddenly map quest [sic] directions went off interrupting the proceedings with loud driving directions." However, at the hearing on the Joneses'

19

motion, the trial judge chastised the Joneses' counsel to "be accurate as to what the Court was doing." The trial judge then admitted that his cell phone "went off" during trial,[6] but pointed out that the Joneses' trial counsel's cell phone rang during trial as well. The trial judge also stated that he apologized to the jury after his cell phone rang. Further, the trial judge explained that he was not reading the newspaper, but instead was reviewing the advance sheets from the Daily Journal.

Based on the record before us, there simply is not enough evidence that the trial judge committed misconduct. We see no problem with the trial judge's explanation to the jury about what he would be doing on the bench during trial. He emphasized that although it might appear that he was not paying attention, he actually was. Additionally, he informed the jury why he needed to multi-task and what tools he had available that allowed him to work on other matters while paying attention during trial. In essence, he was instructing the jury not to be influenced regarding the merits of the case based on his multi-tasking during trial.

In addition, as best we can glean from the record, there were two other occasions of concern. One, the trial judge allegedly was not paying attention to a witness's testimony because he was reading the Daily Journal. Two, either the trial judge's cell phone rang or his computer provided loud driving directions, which interrupted a witness's testimony. Although we do not deem the reading of the Daily Journal while a witness is testifying during trial to be the most appropriate conduct, it falls short of

---

6    There is a dispute in the record regarding whether the trial judge's cell phone rang or MapQuest provided "loud directions" during a witness's testimony.

judicial misconduct. And the interruption, be it from a ringing cell phone or MapQuest directions, occurred once and the trial judge apologized to the jury. This too does not raise the specter of judicial misconduct. In short, the complained of conduct does not raise to the level of judicial conduct in any of the cases the Joneses cite. (See *Gonzalez v. Commission on Judicial Performance* (1983) 33 Cal.3d 359, 373 [trial judge left the bench in the middle of trial]; *State v. Hayden* (Kan. 2006) 130 P.3d 24, 34-35 [court's disdain for the parties injected throughout the proceedings]; *DiMonte v. Neumann Medical Center* (Pa. 2000) 751 A.2d 205, 207-210 [trial judge repeatedly made and received business and personal telephone calls during trial and left the bench to climb onto a table near the witness stand to adjust the heating vent during a witness's testimony].)

Although we do not find the conduct at issue here rises to the level of judicial misconduct, we emphasize the importance that a trial judge act appropriately and exhibit the proper decorum during trial. We understand that the recent budget cuts have put a significant strain on trial courts, and judges are being asked to take on more responsibility with less staff. Nevertheless, the trial judge must still appropriately convey the seriousness of the trial and the jury's task at hand after a jury is empanelled. Many of the jurors are forced to miss work, have their schedule interrupted, and indeed, may feel the need to multi-task while serving on a jury. Yet, as the trier of fact, every juror must focus on the evidence presented and pay attention throughout trial. Regardless of any instruction provided to the jury, a juror inevitably will notice the demeanor and attentiveness of the trial judge. Although we appreciate the need to, at times, multi-task,

21

it is important that the trial judge is sufficiently engaged in the trial before him or her and conveys as much to the jury.

## DISPOSITION

The judgment is reversed and the cause is remanded to the trial court for a new trial solely on the issue of noneconomic damages as to Karen Jones. Depending on the amount of noneconomic damages awarded to Karen at the conclusion of trial, the trial court is ordered to revisit the impact of Cooke's Code of Civil Procedure section 998 offers and enter an appropriate judgment after the retrial. No issues as to Hiram Jones should be retried. The parties shall bear their own costs on appeal.

HUFFMAN, Acting P. J.

WE CONCUR:

NARES, J.

McDONALD, J.

22